**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Eddie Louis TAYLOR, Defendant–**
**Appellant.**

**No. 89–6396.**

United States Court of Appeals,
Sixth Circuit.

Reargued May 22, 1991.

Decided Feb. 10, 1992.

Sidney P. Alexander, Asst. U.S. Atty. (argued and briefed), Ed Bryant, U.S. Atty., Memphis, Tenn., for U.S.

Robert M. Friedman (argued & briefed), Lawrence W. White, Memphis, Tenn., for Eddie Louis Taylor.

Nancy Hollander (briefed), Freedman, Boyd & Daniels, Albuquerque, N.M., for amicus curiae National Ass'n of Criminal Defense Lawyers.

Before MERRITT, Chief Circuit Judge, KEITH, KENNEDY, MARTIN, JONES, MILBURN, GUY, NELSON, RYAN, NORRIS, SUHRHEINRICH, Circuit Judges; and KRUPANSKY, Senior Circuit Judge.*

KRUPANSKY, Senior Circuit Judge.

Defendant-appellant, Eddie Louis Taylor (Taylor), appealed from an order of the district court dated June 30, 1989, denying his motion to suppress evidence discovered by officers of the Memphis, Tennessee police force during a search of his luggage at the Memphis International Airport on October 3, 1988. Subsequent to the trial court's

---

* The Honorable Danny J. Boggs, Circuit Judge, took no part in the consideration or decision of the case.

decision, Taylor entered a conditional plea of guilty to one count of possessing with an intent to distribute 2 kilograms of cocaine, reserving his right to appeal the order denying suppression pursuant to Fed. R.Crim.P. 11(a)(2). Taylor was subsequently sentenced to serve 63 months in prison.

The record disclosed that on October 3, 1988, Taylor flew from Miami, Florida—a high-level source city for drug distribution—to Memphis. Taylor was the only African–American in the initial group of deplaning passengers. The record, however, does not disclose how many additional blacks were included in the steady stream of passengers leaving the aircraft at the Memphis terminal. As Taylor exited the jetway and entered the terminal corridor, he was observed by three plainclothes officers of the Memphis police department who were assigned to the department's Drug Task Force Unit. Without consulting each other, the three officers—Joseph Eldridge (Eldridge), Bonnie Bevel (Bevel), and Britt Roberts (Roberts)—tracked Taylor as he walked from the gate and down the concourse to the terminal's lower-level baggage claim facility. The officers testified that their surveillance was instigated by Taylor's obviously agitated conduct and appearance. Taylor was poorly attired, but carried a new bag over his shoulder. He proceeded rapidly—at almost a running pace—along the corridor, furtively scanning the course of his travel, including the area behind him. He proceeded directly to the curb without claiming any baggage, and was going in the direction of a parking lot situated across the roadway from the terminal.

Eldridge approached Taylor short of the curb and identified himself as a police officer and solicited Taylor for an interview. In his testimony at the suppression hearing, Taylor contradicted Eldridge's version of the events and testified that Eldridge forcibly prevented him from proceeding toward his destination by grasping his elbow and propelling him backward to within several feet of the terminal building's facade. Taylor stated that he observed the officers' firearms, whereas the officers testified that their weapons were completely concealed. There is no dispute that Bevel had joined Eldridge and Taylor on the sidewalk, while Roberts had proceeded to a position across the roadway and adjacent to the parking lot.

In response to Eldridge's inquiries, Taylor volunteered that he lived across the river in Haiti, Missouri and that he had been in Miami for three weeks, but failed to explain the absence of additional baggage to accommodate his extended Miami visit. In further response to Eldridge's questions, Taylor voluntarily produced a one-way ticket from Miami to Memphis that had been purchased with cash, a driver's license with a name corresponding to that which appeared on the airline ticket. Taylor denied the officers' assertions that these items were, immediately subsequent to inspection, returned to him. As the conversation progressed, the officers observed that Taylor was "sweating profusely."

Bevel invited Taylor to permit her to inspect the contents of his shoulder bag. It is not disputed that, in response to this request, Taylor placed the carry-on bag on the sidewalk, unzipped it, riffled through some paper wrappings and other materials in the bag, and simultaneously assured Bevel and Eldridge that the bag contained nothing apart from gifts for his children, which would be of no interest to the officers. Taylor testified that after he shuffled the contents of the bag, he moved to replace it on his shoulder, but that Bevel snatched it from his hand and prevented him from doing so.

Bevel contradicted Taylor by asserting that he voluntarily surrendered the bag upon her renewed solicitation to examine its contents. Bevel and Eldridge stated that Taylor responded "okay" or "naw, go ahead" and backed off, leaving the bag on the ground for Bevel to inspect. Bevel's inspection disclosed two large, spherical bundles wrapped in brown plastic tape, which both Bevel and Eldridge immediately recognized as packaging common to cocaine transportation. Upon this discovery, the officers directed Taylor to accompany them to the Drug Task Force Unit's office inside the airport terminal.

Subsequent to entering the office, Roberts advised Taylor of his *Miranda* rights. Bevel cut open one of the taped balls and chemically field tested its white, powdery contents. The substance tested positive for cocaine. Taylor was thereupon placed under formal arrest. Incident to the arrest, Eldridge searched Taylor's person and discovered $1,000 in cash hidden in each of his socks, and approximately another $900 in his wallet.

In his motion to suppress, Taylor argued that he was unreasonably "seized" within the meaning of the fourth amendment when the three law enforcement officers encountered him on the sidewalk adjacent to the airport terminal building. Taylor also charged that the officers lacked the level of suspicion required as a predicate to an investigative *Terry* stop,[1] and denied, in any event, that he had voluntarily conversed with the officers or had consented to Bevel's inspection of his carry-on bag, or to the subsequent chemical field testing of the contents of the taped balls. Taylor argued that all of the events that transpired subsequent to the initial curbside confrontation outside the terminal—the search of his shoulder bag, his removal to the Drug Task Force Unit's office, the chemical field test of the contents of the taped packages, as well as his arrest and the search that disclosed the large amount of cash he possessed—were the tainted fruit of the initial, allegedly illegal encounter.

In its opinion denying suppression, the district court credited the officers' version of events over Taylor's testimony, and concluded *as a matter of fact* that the initial conversation between the officers and Taylor, including Bevel's search of Taylor's shoulder bag, were consensual.

> The evidence shows Mr. Taylor consented to interview by the officers. The evidence shows he consented to the search of his tote bag. He, in fact, was in possession of two (2) kilograms of cocaine. Mr. Taylor was actually arrested when the cocaine was discovered in

the tote bag. At that point, he was not free to leave the presence of the officers.

The court concluded, as a matter of law, that the arrest immediately subsequent to the discovery of the taped balls was supported by probable cause and did not violate Taylor's fourth amendment rights.

Recognizing that the fourth amendment protects citizens against "unreasonable searches and *seizures*," U.S. Const. amend IV (emphasis added), the Supreme Court and this Circuit consistently have admonished that not every encounter between a civilian and the police constitutes a "seizure" invoking fourth amendment safeguards. Relevant precedent has made clear that a seizure within the meaning and purpose of the fourth amendment does not occur when governmental agents approach a pedestrian, identify themselves as law enforcement officers, and solicit conversation or request an interview. *See, e.g., Immigration and Naturalization Service v. Delgado*, 466 U.S. 210, 215, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984) ("[t]he Fourth Amendment does not proscribe all contact between the police and citizens"); *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) (plurality opinion) ("law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place"); *United States v. Mendenhall*, 446 U.S. 544, 553, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (plurality opinion) ("[t]he purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry"); *United States v. Cooke*, 915 F.2d 250, 251 (6th Cir.1990); *United States v. Winfrey*, 915 F.2d 212, 216 (6th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 709, 112 L.Ed.2d 698 (1991); *United States v. Kelly*, 913 F.2d 261, 264 (6th Cir.1990) ("Initial questioning, without more, is not unlawful.").

Existing precedent teaches that a "seizure" occurs during a police-citizen encounter "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he

---

1. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20     L.Ed.2d 889 (1968).

was not free to leave." *Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877; *accord Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988); *I.N.S. v. Delgado*, 466 U.S. at 215, 104 S.Ct. at 1762; *United States v. Grant*, 920 F.2d 376, 381 (6th Cir.1990); *United States v. Saperstein*, 723 F.2d 1221, 1225 (6th Cir.1983). "The finding that a citizen has been subjected to a fourth amendment search or seizure involves *a question of fact* and cannot be reversed unless clearly erroneous." *United States v. Grant*, 920 F.2d at 381 (emphasis added).

■ In the case at bar, the district court expressly determined that the initial contact between Taylor and the law enforcement officers consisted of no more than a consensual "interview." [2] The trial court's finding of fact was predicated upon the credibility that the judge assigned to the witnesses after having personally evaluated their behavior and manner of testifying, the reasonableness of their testimony, their candor (or lack thereof), the accuracy of their memories, their respective interests or biases in the outcome of the proceeding, and all other indicia of truthfulness that are uniquely within the province of the factfinder—be it judge or jury—to assess.

■ Findings of fact anchored in credibility assessments are generally not subject to reversal upon appellant review. Clear error rarely occurs in the context of airport police-civilian encounters because resolution of fourth amendment issues in this milieu is "going to turn largely on credibility determinations made by the district judge at the suppression hearing." *United States v. Cooke*, 915 F.2d at 252. "Where there are two permissible views of the evidence, the factfinder's choice between them *cannot be clearly erroneous.*" *United States v. Rose*, 889 F.2d at 1494 (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518) (1985) (emphasis added)). *Accord Hernandez v. New York*, —— U.S. ——, 111 S.Ct. 1859, 1871–72, 114 L.Ed.2d 395 (1991). *See Anderson v. City of Bessemer City*, 470 U.S. at 573–74, 105 S.Ct. at 1511 (clearly erroneous standard "plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently"); *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 109 S.Ct. 2678, 2696, 105 L.Ed.2d 562 (1989), *aff'g*, 842 F.2d 825 (6th Cir.1988); *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 498–99, 104 S.Ct. 1949, 1958, 80 L.Ed.2d 502 (1984); *Batts v. NLT Corp.*, 844 F.2d 331, 336 (6th Cir.1988); *Sewell v. Jefferson County Fiscal Court*, 863 F.2d 461 (6th Cir.1988), *cert. denied*, 493 U.S. 820, 110 S.Ct. 75, 107 L.Ed.2d 42 (1989); *Watson v. Fort Worth Bank & Trust*, 798 F.2d 791, 798–99 (5th Cir.1986), *cert. granted, in part*, 483 U.S. 1004, 107 S.Ct. 3227, 97 L.Ed.2d 734, *motion denied*, 484 U.S. 961, 108 S.Ct. 448, 98 L.Ed.2d 388 (1987), *and vacated*, 487 U.S. 977, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988). *See also Mendenhall*,

---

**2.** In reaching this factual conclusion, the district court credited the officers' version of events over that of Taylor, and, *a fortiori*, decided that a reasonable individual in Taylor's position would have felt free to ignore the officers' invitation to engage in a conversation, and proceed on his way. In this context, it is of no consequence that Eldridge testified that he would have pursued Taylor if he had fled. "The subjective intent of the officers is relevant to an assessment of the fourth amendment implications of police conduct *only to the extent that that intent has been conveyed to the person confronted.*" *United States v. Rose*, 889 F.2d 1490, 1493 (6th Cir.1989) (citing *Mendenhall*, 446 U.S. at 554 n. 6, 100 S.Ct. at 1877 n. 6) (emphasis added); *accord Smith v. Heath*, 691 F.2d 220, 223 (6th Cir.1982). The record in the case at

bar fails to disclose either directly or by implication that Eldridge conveyed his subjective intentions to Taylor.

Moreover, if Taylor had fled and thereby engaged the officers in hot pursuit, then he would not, in any event, have been "seized" during the time leading up to his actual, physical apprehension. This is so even if—contrary to the facts of this case—the officers' words and actions, *ab initio*, clearly conveyed to Taylor that he was not free to leave. *See California v. Hodari D.*, —— U.S. ——, 111 S.Ct. 1547, 1551–52, 113 L.Ed.2d 690 (1991) (even if officer's conduct upon encountering suspect constitutes sufficient "show of authority" to apprise suspect that he is not free to leave, no seizure occurs if suspect fails to comply with that injunction and takes flight).

446 U.S. at 557, 100 S.Ct. at 1879 (if trial court's factual finding on motion to suppress is sustained in the record, then appeals court is "mistaken for substituting for that finding its view of the evidence").

█ The district court's factual conclusion in the instant case that the initial encounter was not a "seizure" was factually supported by the record developed below, and was, as a matter of law, fully consistent with the published opinions of the Supreme Court and this court mandating that a "seizure" does not occur when officers approach an individual and, after identifying themselves, request an interview and an opportunity to inspect the individual's driver's license and airline ticket. *See, e.g., Mendenhall,* 446 U.S. at 555, 100 S.Ct. at 1877 (suspect "was not seized simply by reason of the fact that the agents approached her, asked her if she would show them her ticket and identification, and posed to her a few questions"); *Winfrey,* 915 F.2d at 216 ("[t]he request for, and examination of, an airline ticket and driver's license do not amount to a seizure under the fourth amendment") (citing *Royer,* 460 U.S. at 501, 103 S.Ct. at 1326). While the test for a "seizure" is " 'flexible enough to be applied in a whole range of police conduct in an equally broad range of settings, it calls for consistent application from one police encounter to the next, regardless of the particular individual's response to the actions of the police.' " *United States v. Cooke,* 915 F.2d at 252 (quoting *Michigan v. Chesternut,* 486 U.S. at 574, 108 S.Ct. at 1979). Failure to consistently apply this court's established seizure jurisprudence to substantively indistinguishable factual scenarios would seriously undermine the ability of a police officer acting within this judicial circuit to " 'determine in advance whether the conduct contemplated will implicate the Fourth Amendment.' " *Id.*[3]

█ The district court also concluded as a matter of fact that Taylor consented to Bevel's search of his carry-on bag. The question of whether Taylor voluntarily tendered his shoulder bag for examination, or whether its inspection was the tainted product of unlawful duress or coercion, "is a question of fact to be determined from the totality of the circumstances." *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2047–48, 36 L.Ed.2d 854 (1973). " 'The district court's findings with regard to voluntariness will not be reversed unless clearly erroneous.' " *United States v. Rose,* 889 F.2d at 1494 (quoting *United States v. Jones,* 846 F.2d 358, 360 (6th Cir.1988) (per curiam)). *See Anderson v. City of Bessemer City,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985); *Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 109 S.Ct. 2678, 2696, 105 L.Ed.2d 562 (1989), *aff'g,* 842 F.2d 825 (6th Cir.1988); *Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 498–99, 104 S.Ct. 1949, 1958, 80 L.Ed.2d 502 (1984); *Batts v. NLT Corp.,* 844 F.2d 331, 336 (6th Cir.1988); *Sewell v. Jefferson County Fiscal Court,* 863 F.2d 461 (6th Cir.1988), *cert. denied,* 493 U.S. 820, 110 S.Ct. 75, 107 L.Ed.2d 42 (1989); *Watson v. Fort Worth Bank & Trust,* 798 F.2d 791, 798–99 (5th Cir.1986), *cert. granted, in part,* 483 U.S. 1004, 107 S.Ct. 3227, 97 L.Ed.2d 734, *motion denied,* 484 U.S. 961, 108 S.Ct. 448, 98 L.Ed.2d 388 (1987), *and vacated,* 487 U.S. 977, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988). *See also Mendenhall,* 446 U.S. at 557, 100 S.Ct. at 1879 (if trial court's factual finding on motion to suppress is sustained in the record, then appeals court is "mistaken for substituting for that finding its view of the evidence"). Proof of voluntary consent must be "by clear and positive testimony" and the consent must be proven to have been "unequivocal, specific, intelligently given, uncontaminated by any duress or coercion."

---

**3.** The Supreme Court has repeatedly noted the importance of "providing 'clear and unequivocal' guidelines to the law enforcement profession." *Arizona v. Roberson,* 486 U.S. 675, 682, 108 S.Ct. 2093, 2098, 100 L.Ed.2d 704 (1988); *see*

*also California v. Acevedo,* — U.S. ——, 111 S.Ct. 1982, 1990, 114 L.Ed.2d 619 (1991) (noting "virtue" of providing clear rules to law enforcement personnel).

*United States v. Williams*, 754 F.2d 672, 675 (6th Cir.1985).

■ In determining that Taylor voluntarily consented to the search of his bag, the district judge again relied upon his personal observations of the witnesses and assigned greater credibility to the testimony of the officers than he assigned to that of Taylor, thus reaching a factual conclusion that was not clearly erroneous. As found by the district court, "the evidence shows [that Taylor] consented to the search of his tote bag." The consent was given unequivocally and, moreover, was uncontaminated by duress or coercion because it occurred within the context of a consensual conversation.

■ During her search of Taylor's bag, Bevel noted the presence of two spherical, tape-bound parcels, and immediately identified the packaging as that which is unique to the transportation of cocaine. Upon making this very incriminating discovery, the officers directed Taylor to accompany them to their office at the airport. The district court correctly concluded that Taylor was at that moment "seized" within the meaning of the fourth amendment. *See Florida v. Royer*, 460 U.S. at 501, 103 S.Ct. at 1326 (suspect seized when, among other things, officers asked him to accompany them to a police room and retained possession of his ticket and driver's license); *United States v. Garcia*, 866 F.2d 147, 151 (6th Cir.1989) ("the one occurrence which seems to separate 'seizures' from casual contacts between police and citizens is when the defendant is asked to accompany the police or agents to a place to which the defendant had not planned to go").

■ At the point in time when the officers directed Taylor to accompany them to their airport office, they knew that Taylor: had arrived in Memphis from a high-profile drug source city; had rapidly walked through the airport terminal; had glanced furtively in every direction as if conducting "counter-surveillance"; had no luggage beyond the new shoulder bag he carried, despite his asserted three-week sojourn in South Florida; had paid cash for his one-way air passage from Miami to Memphis; had acted nervously, sweated profusely, and had provided implausible answers to several of the officers' inquiries; and, notwithstanding his contention that his shoulder bag contained nothing but gifts for his children, was carrying two highly suspicious packages therein. Bevel's discovery of the taped balls, coupled with the full spectrum of facts known about Taylor when he was seized, not only gave rise to the reasonable suspicion necessary to subject Taylor to a limited investigative *Terry* stop, but, more importantly, also provided the officers with probable cause to arrest him. *See United States v. Sokolow*, 490 U.S. 1, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) ("Probable cause means 'a fair probability that contraband or evidence of a crime will be found.'") (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983)).[4]

In summary, this court concludes that because the district court—in factual findings anchored in credibility assessments—expressly determined that the initial curbside encounter between Taylor and the officers was consensual, and because the district court also expressly concluded that the initial search of Taylor's bag was equally consensual and uncoerced, it is unnecessary to consider or decide either the specific factual question of whether the officers' surveillance of Taylor was motivated to any degree by his race, or the broader constitutional issue of whether the alleged incorporation of a racial component into the DEA's drug courier profile would, if true, violate an individual's rights to due process and equal protection of the laws.

A review of the suppression hearing transcript, the briefs and arguments of counsel before the trial court and initially before this court, disclosed no charge that the appellant herein had been selected for a consensual interview because he was an African–American, that the law enforce-

---

**4.** The existence of probable cause upon discovery of the taped balls renders academic any discussion of whether Taylor was subjected to a *Terry* stop or was arrested when he was taken to the police office.

ment officers at the Memphis Airport implemented a general practice or pattern that primarily targeted minorities for consensual interviews, or that they had incorporated a racial component into the drug courier profile. A factually supported record of such charged official conduct in the instant case would have given rise to due process and equal protection constitutional implications cognizable by this court.

Accordingly, for the foregoing reasons, the judgment of the district court is hereby AFFIRMED.

RALPH B. GUY, Jr., Circuit Judge, concurring.

Although I agree that the district court should be affirmed, I have a slightly different view of what we are doing and not doing in our en banc consideration of this case. When this case was in the district court, the contours of what Judge Krupansky refers to as the "consensual interview" doctrine were not as clearly outlined as they are today. For example, we had not decided *United States v. Flowers*, 909 F.2d 145 (6th Cir.1990), which discusses the three different categories of police-citizen encounters.

The significance of this is the consensual interview theory had not permeated down to and been absorbed by the investigative agencies, and most airport search cases were being presented as "profile" cases. I believe that was the case here; however, the district judge correctly chose to classify the initial encounter as a consensual interview and then went on to hold there was no seizure. At this point in the analysis, the issue of race was not involved, since race was only implicated as a "profile" issue in the district court.

On appeal, the panel concluded, contrary to the district judge, that there was a seizure and then proceeded to work backwards and conclude there was no justifiable basis for the seizure. In the course of making the "justifiable basis" analysis, the issue of race entered the picture.

On en banc review, we now essentially conclude that the panel erred in substituting its judgment for that of the trial court on the factual issue of consent as well as substituting its credibility determinations for those of the district judge. This, to me at least, is the significant aspect of our en banc holding. This is not a case reviewed en banc for the purpose of clarifying airport search law, but it is one designed to reaffirm the principle that, although an appellate court may not like the result reached in the district court, it does not have carte blanche to change those results when "clearly erroneous" is the standard of review.

Although our decision to en banc a case has the effect of vacating the earlier panel decision and placing the district court decision directly before us for review, that is somewhat unrealistic in this case because what is really being considered are the appropriate perimeters of appellate review. By substituting its judgment for that of the district court on the factual seizure and consent issues, the panel bootstrapped its way into the reasonableness discussion, which then arguably made legitimate the discussion of the race issue.[1] In short, I believe this case was set for en banc consideration not to quarrel with the panel's treatment of the race issue, but to review the appropriateness of reaching the race issue.

Having said all of that, however, I now get to the real point of writing a concurrence when I agree with the decision to affirm. The majority opinion could be read as concluding that, where first encounters are consensual, racial considerations are irrelevant. I would disagree. If it were to be shown, for example, that the persons selected for consensual interviews are blacks, who are stopped only because they are black, then I would find the procedure raises serious constitutional concerns.[2]

---

**1.** In the district court, the defendant filed two memoranda in support of his motion to suppress, and neither document mentioned race. Similarly, in defendant's initial brief to the pan-el that first heard this case, there was no mention of race.

**2.** There are drug task forces in operation in this circuit which have for their primary purpose

Thus, I share our original panel's concerns about a procedure that would target primarily minorities for consensual interviews, but I believe its good faith concern over this issue led to reaching and deciding an issue in a manner inconsistent with the normal scope of appellate review and on the basis of a record never properly developed in the district court.[3]

DAMON J. KEITH, Circuit Judge, dissenting, joined by Chief Judge MERRITT; and MARTIN and JONES, Circuit Judges.

Laying aside the legality of the seizure and the subsequent search of Taylor under established fourth amendment principles for the moment, the Drug Enforcement Agency ("DEA") personnel stopped Eddie Louis Taylor ("Taylor") in the Memphis airport on October 3, 1988 solely because he was an African–American. The majority opinion cavalierly dismisses this controversial and important fact and categorically concludes:

> [B]ecause the district court—in factual findings anchored in credibility assessments—expressly determined that the initial curbside encounter between Taylor and the officers was *consensual,* and because the district court also expressly concluded that the initial search of Taylor's bag was equally *consensual and uncoerced, it is unnecessary to consider or decide either the specific factual question of whether the officer's surveillance of Taylor was motivated to any degree by his race, or the broader constitutional issue of whether the alleged incorporation of a racial component into the DEA's drug profile, if true, violates an individual's rights to due process and equal protection of the laws.*

Majority op. at 578 (emphasis added). We cannot accept the majority's evasive and cursory disclaimer or its characterization of this police-citizen encounter as "consensual and uncoercive" given the objective facts. We, therefore, must dissent.

## I.

The record strongly indicates that racial assumptions provided the basis for the DEA officers' initial contact with Taylor. Clearly, the officers must operate within the dictates of the established fourth amendment doctrine for the proscription of "unreasonable" searches and seizures. *See Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979); *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); *United States v. Brignoni–Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). We acknowledge that the Supreme Court has recognized the existence of a threshold governmental practice whereby officers may stop citizens and secure cursory information. *Florida v. Bostick,* —— U.S. ——, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991); *Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), *see also* Tracey Maclin, *The Decline of the Right to Locomotion: The Fourth Amendment on the Streets,* 75 Cornell L.Rev. 1258 (1990). In *Bostick,* the Supreme Court explained this "right to inquire" and firmly established that an officer may approach an individual and ask general questions of that individual (e.g., identification and request for consent to search his or her luggage), "so long as a reasonable person would feel free to disregard the police and go about his business" and "as long as the police do not convey a message that compliance with their requests is required." *Bostick,* 111 S.Ct. at 2386. Before reaching

---

the interdiction of drugs from the Caribbean area. If their experience is that persons of color are usually used as couriers, such a task force might well select such persons as "targets" of consensual interviews without offending the Constitution. This example illustrates the importance of a proper record being made in the district court.

3. There was some effort made after the case was scheduled for an en banc hearing to expand the record and provide a basis for reaching beyond what was before the district court. Although we can expand the scope of legal issues before us, I believe it is improper to attempt to build a record different from that before the district court.

the *Bostick* inquiry, however, we would emphasize that the Constitution's fourteenth amendment prohibits state actors from denying persons the equal protection of the laws. U.S. Const. amend. XIV, sec. 1. *See also J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1986) and *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986). Equal protection principles simply prohibit state actors from using a citizen's race to catalyze this "right to inquire."

Recently, the Fifth Circuit observed: "the heart of the equal protection clause is its prohibition of discriminatory treatment. If a governmental actor has imposed unequal burdens based upon race, it has violated the clause." *Samaad v. City of Dallas*, 940 F.2d 925 (5th Cir.1991). The crucial distinction when applying equal protection principles is that made between government and private actors. *Reynolds v. Little Rock*, 893 F.2d 1004, 1008 (8th Cir.1990).

Traditionally, any state action singling out a person solely on the basis of race has been given the strictest scrutiny, and generally, that action has been condemned by the courts. *See, e.g., City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 507, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) (holding the City of Richmond's voluntary affirmative action plan was not "narrowly tailored to remedy prior discrimination," a compelling governmental interest). In *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), the Supreme Court stated:

> Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another. It is also not infrequently true that the discriminatory impact—in the jury cases for example, the total of seriously disproportionate exclusion of Negroes from jury venires—may for all practical purposes demonstrate unconstitutionality because in various circumstances the discrimination is very difficult to explain on nonracial grounds.

*Id.* at 242, 96 S.Ct. at 2048-49. *See also Arlington Heights v. Metropolitan Dev. Corp.*, 429 U.S. 252, 266, 97 S.Ct. 555, 563-64, 50 L.Ed.2d 450 (1977). While *Washington v. Davis* rejected the notion that a law is invalid under an equal protection analysis "simply because it may affect a greater proportion of one race than another", *Washington v. Davis*, 426 U.S. at 242, 96 S.Ct. at 2049, the Supreme Court was concerned with the practice of inferring a subjective, purposeful intent solely from statistical disparate impact. Here, not only does a disproportionate impact exist,[1] but also the DEA has all but reduced to writing a practice of singling out African–Americans for drug courier inquiries, a facially discriminatory policy. *See* Sheri Lyn Johnson, *Race and the Decision to Detain a Suspect*, 93 Yale L.J. 214, 234 (1983) ("Although the DEA has refused to commit the entire [drug courier] profile to writing, the profile clearly contains a racial component."). *See generally* Morgan Cloud, *Search and Seizure By The Numbers: The Drug Courier Profile and Judicial Review of Investigative Formulas*, 65 B.U.L.Rev. 843 (1985) (discussing the history and use of drug profiles).

The disproportionate number of African–Americans who are stopped indicates that a racial imbalance against African–Americans does exist and is implicitly sanctioned by the law enforcement agency. The assumption that seventy-five percent of those persons transporting drugs and other contraband through public modes of transportation are African–American is impermissible. It flies in the face of reason and legitimates a negative stereotype of African–Americans. Surely, this practice must "be subjected to the strictest scrutiny and [can be] justified only by the weightiest of considerations." *Rogers v. Lodge*, 458 U.S. 613, 619, 102 S.Ct. 3272, 3276, 73 L.Ed.2d 1012 (1981). If our "right of locomotion", "right to be let alone," or simply our right

---

**1.** One of the officers admitted at the evidentiary hearing that at least seventy-five percent of those followed and questioned in these consensual police stops are black. *See* Joint Appendix at 117. Transcript at 211 (Officer Bevel testifying).

to be free from capricious and arbitrary government interference in public places is to mean anything, then this race-based practice must stop. *See generally, The Decline of the Right to Locomotion*, 75 Cornell L.Rev. at 1260–64.

We cannot allow law enforcement officers to cloak what may fairly be characterized as a racist practice in a generic drug courier profile that openly targets African–Americans. The actions of these officers were particularly egregious. Taylor was one of the first few people to deplane the Miami flight. At the time that he was stopped, Taylor was the only black who had deplaned. In fact, the officers testified that they believed Taylor may have been the only black person on the flight. As we discuss below, their purported reasons for stopping Taylor were questionable.[2] The only truly objective fact that could have given rise to the officers' suspicion was that Taylor was black. Yet the majority ignores this clear evidence that the DEA agents, state personnel, targeted Taylor when it carried out its law enforcement duties.

We believe that facts show that the DEA singled out Taylor and stopped him solely because he was an African–American male. The majority, by refusing to address the clear evidence of race-based conduct, has endorsed the frightening proposition that a defendant's subsequent, alleged consent legitimates a governmental practice that violates the principles embodied in the equal protection clause. This court, in effect, permits a state actor to inject racist attitudes into the carrying out of what should be color-blind law enforcement. This court has embarked upon a dangerous journey by revisiting the practice of issuing "general warrants"[3] for police action. *See* Potter Stewart, *The Road to Mapp v. Ohio and Beyond: the Origins, Development, and Future of the Exclusionary Rule in Search and Seizure Cases*, 83 Colum.L.Rev. 1365, 1369 (1983). Only this time, these "general" warrants have "specific" targets—African–Americans. The use of an immutable characteristic as the basis of suspicion for criminal activity is patently unconstitutional, and the notion that DEA agents and like state personnel can consider race in carrying out its duties is nothing short of outrageous and cannot be permitted.

A highly publicized example of the potential abuse to which such a practice is subject occurred in 1988 when baseball Hall of Famer Joe Morgan was accosted by state agents in the Los Angeles International Airport. L.A. Times, Aug. 11, 1990, at B6, col. 1. Morgan was on a layover during a trip from Oakland, California where he is a successful businessman, to Tuscon, Arizona, where he was to participate in a golf tournament. *Id.* While he was making a phone call, an officer approached Morgan and asked him for identification.[4] *Id.*

2. For example, Sergeant Eldridge testified that Taylor appeared "different" from the other deplaning passengers because he was clad in clothing that was not typical of "the passengers that would come from Miami [on] flights in real casual nice looking clothes". This observation is inherently subjective and subject to great abuse. Anyone, especially the only African–American among the first few passengers to deplane, may appear "different".

3. Described as the most powerful legal weapon against critics of the crown in pre-Revolutionary War England, these warrants were "issued without a showing of probable cause and often without suspicion of criminal wrongdoing; no particular individual was charged with violating the law; no name appeared on the warrants; and [they were] valid for the duration of the life of the monarch under whose name they were issued." Potter Stewart, *The Road to Mapp v. Ohio and Beyond: the Origins, Development,*

*and Future of the Exclusionary Rule in Search and Seizure Cases*, 83 COLUM.L.REV. 1365, 1369 (1983).

Former Justice Stewart asserts that the framers of the fourth amendment were wary of this practice and adopted the fourth amendment to guard against use of the general warrant to "jeopardize the liberty of every citizen." *Id.* We must be concerned that if we allow such a process to continue under the guise of a "war on drugs", we will be jeopardizing the fundamental liberty that the framers sought to secure.

4. The officer later stated that he and a Drug Enforcement Agent were assigned to investigate drug smuggling activity at the Airport; and they thought that Morgan may have been travelling with another African–American man, Tony Floyd, whom the DEA had handcuffed nearby. Note that the agents found no drugs in Floyd's luggage or on Morgan's person. N.Y. Times, Feb. 16, 1991, sec. 1, page 46, col. 5.

Although the events of the next few moments are in dispute, it is clear that Morgan attempted to identify himself;[5] and the officer grabbed Morgan, threw him to the floor, and handcuffed him before a crowd of onlookers. UPI Press Release, Feb. 15, 1991 (NEXIS, Los Angeles Dateline). The officer then led him away to a closed room with his hands over his mouth. *Id.* The officer testified in the civil suit brought by Morgan against the City of Los Angeles and the officer that he approached Morgan because the former baseball player acted suspiciously and threw him to the floor only after Morgan became belligerent. L.A. Times, Feb. 15, 1991, at B1, col. 2. After awarding Mr. Morgan $540,000 in compensatory and punitive damages, some jurors expressed the belief, however, that Mr. Morgan was singled out because he was black and that he was victimized by the officer. *Id.* Moreover, testimony in the civil suit indicated that when the officer led Morgan away he stated: "I'm an authority figure and I'm going to show you what authority is all about." *Id.*

The state may not separate all drug couriers into two classes—one black class and one white class—and then adopt and execute a policy of enforcement against the black class only. The Second Circuit has explicitly rejected such a practice. *See United States v. Ceballos,* 654 F.2d 177, 185–86 (2d Cir.1981). In *Ceballos,* the police attempted to justify an arrest by claiming that a defendant fit a "profile" of customers of suspected narcotics dealers because he was a "hispanic male." *Id.* Concluding that the government lacked probable cause to arrest Ceballos, the Second Circuit stated:

> [T]he government's contention that Ceballos fit an alleged "profile" of [a narcotic's dealers] customers (hispanic males) is an *inappropriate* attempt to broaden the limited acceptance which has been given to the DEA's drug courier

profile in the context of airport *Terry* stops.

*Id.* (emphasis added).

We must recognize the wisdom of our sister circuit. Equal protection principles simply forbid this type of state action. The government, under the majority's rationale, legally can continue to engage in this type of race-based profile. The majority effectively holds that federal courts will not consider this volatile issue if subsequent consent by a defendant occurs or if the party has not yet been seized within the meaning of the fourth amendment. Yet the majority offers no citation of authority for the proposition that race discrimination in law enforcement is unreviewable or constitutional. We would be abdicating our judicial responsibility by endorsing a racist law enforcement policy, sub silencio. By refusing to address the racial element that is at the forefront of this case, the majority has deferred to a potentially abusive and constitutionally impermissible practice. We simply cannot and will not join such an opinion.

## II.

Additionally, Taylor contends that the district court erred in finding that he was not seized in violation of the fourth amendment. Taylor maintains that his fourth amendment rights were violated when the officers seized him on the sidewalk outside of the Memphis International Airport terminal. We agree.

## A.

The fourth amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated...." U.S. Const. amend. IV. The fourth amendment requires the existence of objective justifications for all searches and seizures "including seizures that involve only a brief detention short of traditional arrest." *Reid v. Georgia,* 448 U.S. 438, 440, 100 S.Ct. 2752,

---

5. A witness at trial also testified that he attempted to intercede and explain to the officer who Joe Morgan was. The officer rebuffed any such attempt and told the witness not to interfere. UPI Press Release, Feb. 15, 1991 (NEXIS, Los Angeles Dateline).

2753, 65 L.Ed.2d 890 (1980) (quoting *United States v. Brignoni–Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607 (1975)). Although there are some circumstances under which a person may be detained briefly, without probable cause,[6] "any curtailment of a person's liberty by the police must be supported at least by a reasonable and articulable suspicion that the person seized is engaged in criminal activity." *Reid*, 448 U.S. at 440, 100 S.Ct. at 2754. *See also Brown v. Texas*, 443 U.S. 47, 51, 99 S.Ct. 2637, 2640–41, 61 L.Ed.2d 357 (1979); *Delaware v. Prouse*, 440 U.S. 648, 661, 99 S.Ct. 1391, 1400, 59 L.Ed.2d 660 (1979); *Brignoni–Ponce*, 422 U.S. at 878, 95 S.Ct. at 2578; *Terry v. Ohio*, 392 U.S. 1, 16–19, 88 S.Ct. 1868, 1877–79, 20 L.Ed.2d 889 (1968).

We recognize that our government is in the midst of waging a "war on drugs." Yet, the valiant effort of our law enforcement officers to rid society of the drug scourge cannot be done in total disregard of an individual's constitutional rights. In *United States of America v. Radka*, 904 F.2d 357 (6th Cir.1990), we addressed this problem:

> Presently, our nation is plagued with the destructive effects of the illegal importation and distribution of drugs. At this critical time, our Constitution remains a lodestar for the protections that shall endure the most pernicious affronts to our society.... The drug crisis does *not* license the aggrandizement of governmental power in lieu of civil liberties. Despite the devastation wrought by drug trafficking in communities nationwide, we *cannot* suspend the precious rights guaranteed by the Constitution in an effort to fight the 'War on Drugs.'

*Id.* at 361 (emphasis added). Law enforcement officers cannot ignore the protections guaranteed by our Constitution—law enforcement officers cannot subject individuals to random invasions of their privacy. *See Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (discussing the expectation of privacy embodied in the principles of the fourth amendment).

Each case raising a fourth amendment issue "must be judged on its own facts." *United States v. Saperstein*, 723 F.2d 1221, 1227 (6th Cir.1983) (quoting *United States v. Mendenhall*, 446 U.S. 544, 565 n. 6, 100 S.Ct. 1870, 1883 n. 6, 64 L.Ed.2d 497 (1980)). Here, the initial issue to be resolved is whether Taylor was seized and, if so, when. The test for determining whether a seizure has occurred is "whether, under the totality of the circumstances, a reasonable person would have believed he or she was not free to walk away." *Saperstein*, 723 F.2d at 1225 (citations omitted). *See also Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877; *United States v. Clardy*, 819 F.2d 670, 672 (6th Cir.1987); *United States v. Lucci*, 758 F.2d 153, 155 (6th Cir.), *cert. denied*, 474 U.S. 843, 106 S.Ct. 129, 88 L.Ed.2d 106 (1985). Circumstances that might indicate a seizure, "even where the person did not attempt to leave, would be *the threatening presence of several officers*, the display of a weapon by an officer, some *physical touching of the person* of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request *might be compelled*." *Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877 (emphasis added). *See also Terry*, 392 U.S. at 19 n. 16, 88 S.Ct. at 1879 n. 16.

The objective facts of this case indicate that the officers seized Taylor as he stood outside the airport and prepared to cross the street. Taylor testified that upon exiting the airport terminal, Officer Eldridge grabbed his arm and forced him back from the curb to talk to him:

Q: Okay. Now, when was the first time that you knew that a police officer was following you?

A: Well, I didn't really know that a police officer was following me at all. What I done, (sic) when I got ready to step off the sidewalk, as I got ready to step off the sidewalk, someone said, excuse me, sir. I didn't even bother to look back. And then they (sic) said, excuse

---

**6.** *See United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (citing

*Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968)).

me, sir, again. And as he said, excuse me, sir, the second time, he's pulling my arm, he's got me by the arm pulling me back. I am referring to Sergeant Eldridge....

Q: And the first time—what were you, how were you physically standing in relationship to the curb or the sidewalk when this officer seized your elbow?

A: I was standing right at the edge of it. My toes were almost on the edge, almost where they would hang off. I was standing there. And when this one car passed by, I started to step down. When I started to step down, that is when he pulled me completely back up on the sidewalk....

Joint Appendix at 131–33. Transcript at 348–50. Taylor further testified that the officers surrounded him. The officers, albeit plainclothed, positioned themselves so that Taylor could not pass.[7] Both Sergeant Eldridge and Officer Bevel asked Taylor a barrage of questions that he felt *compelled* to answer, particularly since he felt he could not leave. Moreover, on two separate occasions during the evidentiary hearing, Sergeant Eldridge testified that if Taylor attempted to leave at any point during the questioning—*before* the cocaine was found—he would have given pursuit.[8] This admission lends credence to the assumption that he communicated that intent to Taylor.

Accordingly, under the totality of the circumstances and factors enunciated in

*Mendenhall,* a reasonable person would not have felt free to walk away. Several officers were present and positioned so that Taylor would reasonably understand that he was not free to go. Additionally, Officer Eldridge grabbed Taylor's arm and physically pulled him back onto the sidewalk. Finally, the officers asked Taylor a number of questions that clearly cannot be characterized as information solely for identification purposes such as that referred to in *Florida v. Bostick,* 111 S.Ct. at 2386. Therefore, we believe that Taylor was seized when he was stopped on the sidewalk outside of the terminal.

### B.

Since the record clearly established that the officers seized Taylor, we must now determine whether the seizure was constitutionally permissible. For fourth amendment purposes, a brief investigatory detention is permissible if "supported by a reasonable and articulable suspicion of criminal activity." *Lucci,* 758 F.2d at 155–56; *See also Reid,* 448 U.S. at 440, 100 S.Ct. at 2754; *Clardy,* 819 F.2d at 672. The totality of the circumstances are considered in determining which suspicions are "reasonable and articulable." *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981).

In *Cortez,* the Supreme Court established a two-step inquiry to determine the legality of a seizure. *Id.* First, the law

---

7. At the evidentiary hearing, Taylor testified that he felt he was not free to leave:

Q: Were they [the officers] on either side of you or both on the same side of you or which way were they?

A: They were in front of me at an angle ... they had enough space ... to where *I couldn't go between them.*

Joint Appendix at 137. Transcript at 357 (emphasis added).

8. On cross-examination, Sergeant Eldridge testified:

Q: Okay. You would have just given pursuit but you wouldn't have tackled?

A: Oh yeah, I would have kept after him.

\* \* \* \* \* \*

Q: [I]f he tried to move, if he tried to run ... you were going to give pursuit?

A: No, sir, I said I would probably give pursuit.....

Q: Why would you give pursuit if you weren't going to stop, so you could run along and get your exercise?

A: No sir, I would follow him to where he was going.

Q: Follow him to where he was going?

A: Yes, sir ... If he took off, I would try to get some kind of communication and have somebody pull in behind him for some more surveillance.

Q: You would try to get him stopped?

A: *Definitely. Somebody at this point, they are definitely involved in something if they take off running.*

Q: They are definitely involved in something.

A: Yeah.

Joint Appendix at 109, 111. Transcript at 98, 105 (emphasis added).

enforcement officials must demonstrate the existence of "some objective manifestation that the person stopped is, or is about to be engaged in criminal activity." *Id.* In this case, a showing that the defendant met several characteristics of the drug courier profile is relevant to determining the legality of the seizure.[9] Merely satisfying the drug courier profile, however, "does not, standing alone, justify a seizure." *United States v. Tolbert,* 692 F.2d 1041, 1047 (6th Cir.1982), *cert. denied,* 464 U.S. 933, 104 S.Ct. 337, 78 L.Ed.2d 306 (1983). *See also Reid,* 448 U.S. at 441, 100 S.Ct. at 2754. Second, under the totality of the circumstances, these objective observations must raise an articulable suspicion that the "particular" individual stopped is engaged in criminal activity. *Cortez,* 449 U.S. at 417, 101 S.Ct. at 694–95.

In the present case, the district court found that both inquiries of *Cortez* were satisfied as Taylor: (1) arrived on a plane from Miami, Florida—a drug source city; (2) walked away from the gate nervously, hurriedly and moved faster than the other passengers; (3) constantly looked backwards as he walked; (4) carried a tote bag that he held tightly to his body; and (5) left the terminal walking very fast. The district court held the above factors provided the officers with a reasonable, articulable suspicion that Taylor was engaged in criminal activity at the time he was stopped. *See* Joint Appendix at 72. Order Denying Motion to Suppress Evidence, *United States v. Taylor,* 88–20270–H. We find that the objective facts do not satisfy the *Cortez* inquiry.

The officers' actions are not justified under *Cortez* because Taylor's actions are common among many who deplane in busy airports. First, travel to and from an alleged drug source city is inherently unsuspicious behavior. In *United States v. Andrews,* 600 F.2d 563 (6th Cir.1979), we explained:

> [T]ravel from Los Angeles cannot be regarded as in any way suspicious. Los Angeles may indeed be a major narcotics distribution center, but the probability that any given airplane passenger from that city is a drug courier is infinitesimally small. Such a flimsy factor should not be allowed to justify—or help justify—the stopping of travelers from the nation's third largest city. Moreover, our experience with DEA agent testimony in other cases makes us wonder whether there exists any city in the country which a DEA agent will not characterize as either a major narcotics distribution center or a city through which drug couriers pass on their way to a major narcotics distribution center.

*Id.* at 567.[10] Accordingly, arrival on a flight from Miami is objectively unsuspicious.

Second, the officers believed that Taylor met the characteristics of a drug courier by walking quickly and nervously through the terminal. It is well-known that police manuals instruct officers to become familiar with their beat and to identify people who do not "belong." *See, e.g.,* Johnson, *Race & the Decision to Detain a Suspect,* 93 Yale L.J. 214, 226 (1983). Sergeant Eldridge testified that Taylor appeared "different" from other deplaning passengers:

---

9. The "drug courier profile" is an abstract of characteristics found to be typical of persons transporting illegal drugs. *Florida v. Royer,* 460 U.S. 491, 493 n. 2, 103 S.Ct. 1319, 1322 n. 2, 75 L.Ed.2d 229 (1983). The Drug Enforcement Administration has not committed the profile to writing. The drug courier profile has not received unanimous approval by either the Supreme Court or this circuit, as the combination of factors looked for vary among agents. *See Saperstein,* 723 F.2d at 1228. Instead, courts are required to determine "whether in each particular case the combination of facts present and the manner in which they are exhibited justifies a stop." *Id.*

10. The government maintains another significant, suspicious factor is that Taylor purchased his one-way ticket to Memphis in cash. Drug couriers benefit from cash transactions because of its anonymity. *See Saperstein,* 723 F.2d at 1228. Here, however, Taylor purchased the ticket *in his own name.* Certainly, purchasing a ticket under one's legal name is uncharacteristic behavior for a drug courier. This casts further doubt not only on the officers' basis for stopping Taylor, but also on the reliability of the drug courier profile.

Q: All right. Now go ahead now, how did the defendant appear on this occasion?

A: He appeared [in] kind of a grunnchy (sic) type work clothes. He had a dirty black baseball cap with something wrote (sic) across the front of it, and little squirrley, kind of like captains wear, the little gold squirrels across the bill....

Q: In the military—called scrambled eggs?

A: There you go—scrambled eggs. And he had on, I think it was, a blue shirt with "Pace" or something written across the pocket. A pair of blue trousers, white tennis shoes.

Q: And why do you say he—why did he stick out?

A: *Well, the rest of the passengers that usually come from Miami flights is* (sic) *either business people or resort type people, people getting off in real casual nice looking clothes.* Like I say, it was just different seeing somebody getting off there looking like Mr. [Taylor] looked that night.

Joint Appendix at 87. Transcript at 11 (emphasis added). This observation is inherently subjective and, therefore, subject to great abuse because people are clad in a wide array of clothing whether or not they are coming from or going to a typical vacation spot. Using the flawed analysis employed by Sergeant Eldridge, *anyone*, including the only African–American to deplane, can not "belong" and fit the drug courier profile merely by their appearance.

Officer Bevel testified that primarily Taylor's nervous behavior caused her to believe that he had or was in the process of committing a crime. *See* Joint Appendix at 120. Transcript at 240. However, people constantly hurry through airports—they are often looking for the party meeting them or rushing to board a connecting flight. Walking fast or even running is not uncommon in an airport. Many people do not check baggage to save time. All of these actions constitute perfectly lawful be-

havior. Yet, when the officers saw Taylor hurrying through the airport, looking around, and not stopping at the baggage area, they determined that he fit the drug courier profile. This determination was inappropriate because observing an individual walking quickly through an airport or nervously looking around is insufficient to warrant a search and seizure.

The *Cortez* Court recognized that an officer "versed in the field of law enforcement", may arguably view these factors as suspicious. *Cortez*, 449 U.S. at 418, 101 S.Ct. at 695. In this case, however, the officers—particularly Sergeant Eldridge who led the pursuit—had little training in identifying a drug courier. Sergeant Eldridge had been with the Memphis Police Department twenty-two years, yet, in October 1988, he had been with the airport drug task force only six months.

Based on the officers' limited experience and the circumstances they observed, we conclude that they reasonably could not have suspected, as a matter of law, that Taylor was engaged in criminal activity.[11] We find it particularly relevant that the *least* qualified officer, Sergeant Eldridge, led the pursuit. The evidence relied upon—Taylor's arriving on a plane from Miami, Florida and walking quickly through the terminal, clutching luggage— "describes a large category of presumably innocent travelers, who would be subject to virtually random seizures were [we] to conclude that as little foundation as there was in this case could justify a seizure." *Reid*, 448 U.S. at 441, 100 S.Ct. at 2754. Therefore, we believe the objectivity required in the first inquiry of *Cortez* was not achieved.

Thus, the officers also failed to meet the second inquiry of *Cortez* because the totality of the factors that they relied upon evidenced unsuspicious behavior. We have held "certain behavior characteristics [are] inherently *unsuspicious* [of criminal activity] and thus, entitled to no weight in the calculation." *Saperstein*, 723 F.2d at 1228

---

**11.** The officer simply followed Taylor because he was black, a constitutionally impermissible

action. *See supra* section I.

(emphasis added). *See, e.g., United States v. Andrews*, 600 F.2d 563, 566 (6th Cir.), *cert. denied sub nom. Brooks v. United States*, 444 U.S. 878, 100 S.Ct. 166, 62 L.Ed.2d 108 (1979) (nervousness deemed consistent with behavior among innocent airport travelers and is entitled to no weight); *United States v. McCaleb*, 552 F.2d 717, 720 (6th Cir.1977) (circumstances where DEA agent observed three persons, two of whom were nervous, return on non-stop flight from Los Angeles to Detroit after short trip with only one suitcase did not provide specific and articulable facts to warrant investigatory stop). The totality of the circumstances, in the present case, did not yield particularized suspicions that warranted a seizure based on a reasonable and articulable suspicion of criminal activity. Thus, we would find Taylor's seizure unconstitutional and believe that the evidence obtained as a result of that seizure should be suppressed.

### III.

Taylor further contends that even if the initial seizure of his person was justified, he never gave the officers verbal or written consent to search his bag. The government argues that Taylor explicitly consented to the search of his bag. The district court found as a matter of fact that Taylor consented to the search. We conclude, however, that such a finding was clearly erroneous.

It is well-settled that without a search warrant and in the absence of probable cause and exigent circumstances, the validity of a search depends on the defendant's purported consent. *See Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1323–24, 75 L.Ed.2d 229 (1983). Furthermore, where the validity of the search rests on consent, the government has the "burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority." *Id. See also Lo–Ji Sales, Inc. v. New York*, 442 U.S. 319, 329, 99 S.Ct. 2319, 2326, 60 L.Ed.2d 920 (1979); *Schneckloth v. Bustamonte*, 412 U.S. 218, 233–34, 93 S.Ct. 2041, 2050–51, 36 L.Ed.2d 854 (1973); *United States v. Williams*, 754 F.2d 672, 674–75 (6th Cir.1985).

Whether Taylor's consent was voluntary or the product of coercion, express or implied, rests upon an analysis of the totality of the circumstances. *See Schneckloth*, 412 U.S. at 227, 93 S.Ct. at 2047–48. We have held that consent "must be proved by clear and positive testimony and must be unequivocal, specific, and intelligently given, uncontaminated by any duress or coercion." *Williams*, 754 F.2d at 675. *See also McCaleb*, 552 F.2d at 721.

There is sufficient evidence of coercion by the officers to negate any belief that Taylor voluntarily consented to the search of his bag. Sergeant Eldridge followed Taylor and pulled him back from the curb and onto the sidewalk. The officers surrounded Taylor so that he felt he could not leave without cooperating. These circumstances set the stage for the officers to elicit a positive response from Taylor to search his bag. Furthermore, the transcript of the evidentiary hearing shows that there was a clear contradiction between Taylor's and the officers' account as to what occurred. The record below, therefore, was not clear and unequivocal. Taylor testified that although he did not consent, he unzipped the bag, looked through it and told the officers he had nothing of interest to them. Officer Bevel stated Taylor did consent to the search. Taylor testified that Officer Bevel jerked the bag from him and violently searched it causing some of the contents to fall on the sidewalk.

Moreover, the officers never informed Taylor that he had the right not to consent to the search of his bag.[12] Even though

---

12. At the evidentiary hearing, Sergeant Eldridge testified that it was not his responsibility to inform Taylor that he had the right not to consent:

    Q: Everything that you consented to—you gave him no chance to consent or not to consent, did you, because you didn't tell him that he had a right not to?

the Constitution does not require " 'proof of knowledge of a right to refuse as the *sine qua non* of an effective consent to a search,' [*Schneckloth*, 412 U.S. at] 234 [93 S.Ct. at 2051] (footnote omitted), such knowledge [or lack thereof is] highly relevant to the determination that there had been consent." *Mendenhall*, 446 U.S. at 558–59, 100 S.Ct. at 1879.[13] At no time during the stop did the officers inform Taylor that he did not have to cooperate and was free to withhold his consent. Considering the totality of the circumstances, we find that Taylor did not freely and voluntarily consent to the search of his bag.

Next, we must determine whether Taylor, when taken to the security office, consented to the continued search of the bag and the opening of one of the packages in which cocaine was found. Here again, we find that Taylor did not consent.

The fourth amendment limits the search and seizure powers "in order to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." *United States v. Martinez–Fuerte*, 428 U.S. 543, 554, 96 S.Ct. 3074, 3081, 49 L.Ed.2d 1116 (1976). A search warrant issued by a neutral and detached magistrate protects individuals from capricious governmental interference. *See Johnson v. United States*, 333 U.S. 10, 13–14, 68 S.Ct. 367, 368–69, 92 L.Ed. 436 (1948). Therefore, warrantless searches are *per se* unreasonable under the fourth amendment. They are upheld only in limited circumstances.[14]

From the testimony, it is evident that the officers asked Taylor to sign both a written statement and a consent to search form. Taylor refused both requests. Absent consent, exigent circumstances or one of the exceptions, a search warrant was needed for the officers to lawfully search Taylor's bag. *See Katz v. United States*, 389 U.S. 347, 356–59, 88 S.Ct. 507, 514–16, 19 L.Ed.2d 576 (1967); 3 C. Wright, Federal Practice and Procedure: Criminal 2d § 666 (1982). The officers had sufficient time and ample opportunity to secure a search warrant; nevertheless a search warrant was never obtained. Because the bag was searched and the package opened without a search warrant, the search was impermissible. *See Katz*, 389 U.S. at 357, 88 S.Ct. at 514. Since we believe that Taylor's consent, if any, was not voluntary, we would conclude that the search was not permissible. Therefore, the cocaine recovered from Taylor's bag should be suppressed as the product of an illegal search and seizure.

## IV.

The mere fact that an African–American is observed walking quickly through an airport terminal does not raise the suspicion of criminal activity. Any attempt to detain such an individual, therefore, *must*

---

A: Well,—you are right, I didn't tell him that he had a right not to.

\* \* \* \* \* \*

Q: Okay. You did want him to know that he had the right to consent?

A: That's up to him. Whether he had knew (sic) he had the right to consent or not, *it is not up to me to advise him that he has the right.* I can come up to any individual on the street and say I'm a police officer, but you don't have to talk to me but will you talk to me.

Q: And you certainly didn't tell him he had a right to refuse you all to go in his bag?

A: No, sir, I did not.

Joint Appendix at 108. Transcript at 96 (emphasis added).

13. In *Mendenhall*, twice the officers expressly told the respondent that she was free to decline to consent to the search. The Court found that these explanations by the officers substantially lessened the probability that their conduct reasonably could have appeared coercive. *See Mendenhall*, 446 U.S. at 558–59, 100 S.Ct. at 1879–80.

14. The exceptions to the warrant requirement include: automobile searches, *United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982); consent searches, *Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); searches incident to a lawful arrest, *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); limited searches and seizures under the stop and frisk doctrine, *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); searches and seizures in hot pursuit of a fleeing felon, *United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976); and searches and seizures to prevent the loss or destruction of evidence, *Vale v. Louisiana*, 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970).

be conducted within the parameters of the fourth amendment. In this instance, the fourth amendment's protections were ignored. The officers failed to establish that a reasonable, articulable suspicion existed to warrant Taylor's detention. Moreover, the facts do not indicate that Taylor consented to the search. Therefore, we would order the suppression of evidence seized pursuant to this unconstitutional arrest, search and seizure. Although we recognize the importance of curtailing illicit drug use in our society, the "War on Drugs" can never license law enforcement officials to disregard the rights guaranteed by the fourth amendment or the principles embodied in the equal protection clause of the fourteenth amendment to our Constitution.

For the foregoing reasons, we would REVERSE the judgment of the district court and REMAND the case for further consideration consistent with this opinion.

BOYCE F. MARTIN, Jr., Circuit Judge, dissenting.

I join in Judge Keith's dissenting opinion and write separately to express my personal belief that the result reached in this case is constitutionally unsound. The majority sanctions unreasonable airport searches as a short-term solution to what has not yet proven to be the long-term problem of a country awash in easily obtainable drugs.

In its war on drugs, the majority has endorsed an airport stop-and-search policy based on hunch and whim rather than any reasonable level of suspicion. I could accept a rule that would, without exception, subject everyone and everything to a stop and a search upon entry to or exit from an airport. I could even accept a rule under which every tenth entrant was stopped. Either of these rules could be clearly articulated and administered in a manner such that everyone who travelled would be treated in the same fashion. Under either of these systems, anyone who travelled would be aware of the objective standard, whether the person was travelling for legal or illegal purposes. What I cannot accept is the purely subjective standard adopted by the majority, which in the present case permits a stop and a search based on race.

The crucial question in this case is the limitation on the power to control freedom of movement. I have never lived under an authoritarian government. I have always believed that freedom from fear of unwarranted governmental intrusion as well as the right to criticize without fear are the cornerstones of a free society. History bears witness to the fact that authoritarian regimes always arise from the executive branch of government rather than the legislative or judicial. Abuse of individual rights by the executive is controlled to a great extent by fear of exposure. With a degree of success, our society regulates the executive through detached, independent and fair-minded review by the judiciary. Here, the majority abdicates this responsibility in favor of expediency, representing once again, the aggrandizement of community rights at the expense of individual freedoms.

When I travel, I am typically attired in a suit and tie and behave in a conventional manner. I doubt that I attract much attention from the airport police, even though I may exhibit signs of nervousness or agitation due to turbulence during a flight or a difficult connection. I face little, if any, possibility of being stopped. Perhaps it is my dress and manner; I believe that it is these factors combined with the fact that I am white. In stark comparison, Mr. Taylor's deplaning begins a long journey down the slippery slope to the past. The police officers testified that Mr. Taylor exhibited signs of nervousness and agitation. It is apparent that because of his race and his clothing in addition to his nervousness, Taylor was singled out as he deplaned.

In reviewing the transcript of the hearing before the district court, I can see no evidence of personal animosity on the part of the airport officers. In fact, the evidence seems to reveal officers attempting to carry out their duty. What they did testify to and what I object most strenuously to is the poor training, the poor guidance, and the absolute inability on the part of the officers to articulate a reason for the

stop and search of Mr. Taylor, other than the relative appearance of his clothing, the fact that he was travelling from Miami to Memphis, and the fact that Mr. Taylor is a black American. This is simply impermissible, even under the weakened and eroded state of the Fourth Amendment.

Good investigation pays off in fair and prompt convictions. Once again, however, our en banc court fails to recognize that we are sliding backwards. *See United States v. Steele*, 933 F.2d 1313, 1328 (6th Cir.1991) (en banc). Under the majority's indefinite standard, it is difficult to discern a scenario where we could find unreasonable, a stop and a search of any non-white person leaving a plane from Miami. Under the majority's standard, would the stop and search be unreasonable if the non-white person was well-dressed and carrying luggage, but appeared nervous and agitated? Would the stop and search be unreasonable if that non-white person was shabbily dressed and carrying luggage, but appeared less nervous than Taylor? What if the non-white person was well-dressed and appeared less nervous than Taylor, but was carrying no luggage? The absurdity of these questions reveals the frightening potential for abuse of the majority's standard. When race is combined with dress characteristics as the means of determining who is to be searched, I believe this squarely violates the Fourth Amendment. Some might argue that Taylor's subsequent conviction weakens my argument, but Taylor's ultimate guilt is not the issue. Guilt is *never* the issue in Fourth Amendment analysis. I believe that the majority's unarticulated, indefinite standard opens the door to abuse. In turn, I believe the growth of this abuse will result in the repetition of our not-too-distant history when only *some* members of our society were able to travel without fear of unwarranted governmental intrusion.

NATHANIEL R. JONES, Circuit Judge, dissenting.

The compelling dissenting opinion of Judge Keith draws my unqualified concurrence. I also join the excellently reasoned dissent of Judge Martin. Their analyses

prompt me to add a word for the purpose of highlighting two serious ironies posed by the majority. In noting these ironies, I have no intention of seeking to add to the scholarship so evident in the masterful opinions of Judges Keith and Martin, for I could not.

This Court must be reminded that its *en banc* opinion in this case comes forth when our nation is concluding its observance of the bicentennial of the Bill of Rights. The case clearly invokes the Bill of Rights and its promises to individual citizens. The majority issues its opinion from a building majestically draped with huge banners proclaiming the bicentennials of both the Bill of Rights and the Constitution. Yet, ironically, the majority reaches a conclusion in its opinion that is unworthy of those heralded documents.

There was absolutely no articulable basis, except that of race, for the law enforcement agents' decision to "fix" on the appellant as he deplaned at the Memphis Airport. He was one of a "steady stream of passengers." *See supra*, p. 574. The claim that Taylor was stopped because he was dressed differently is not at all persuasive, especially considering the assortment of attire that individuals today don for travel, nor is the charge that he was traveling with only one bag. A college student, for example, visiting home or another campus for a weekend, in all likelihood will not be dressed in business attire or resort-wear and, moreover, might well be carrying only an overnight bag. Other judges, courts, and commentators have remarked with amazement, disapproval, and despair that the characteristics of the "drug courier profile" are so fluid as to be contradictory, and so general as to encompass a realm of perfectly innocent behavior. *See, e.g., United States v. Hooper*, 935 F.2d 484 (2d Cir.1991) (Pratt, J., dissenting) ("The 'drug courier profile' ... is so fluid that it can be used to justify designating anyone a potential drug courier if the DEA agents so choose."), *cert. denied*, —— U.S. ——, 112 S.Ct. 663, 116 L.Ed.2d 754 (1991); *United States v. Andrews*, 600 F.2d 563, 566–67 (6th Cir.1979) ("[O]ur ex-

perience with DEA agent testimony ... makes us wonder whether there exists any city in the country which a DEA agent will not characterize as either a major narcotics distribution center or a city through which drug couriers pass on their way to a major narcotics distribution center."), *cert. denied*, 444 U.S. 878, 100 S.Ct. 166, 62 L.Ed.2d 108 (1979); *United States v. Pulvano*, 629 F.2d 1151, 1155 n. 1 (5th Cir. 1980) (recognizing that every major population center has become home for drug trafficking); *United States v. Westerbann-Martinez*, 435 F.Supp. 690, 698 (E.D.N.Y. 1977) (noting that the drug courier profile "seems to change itself to fit the facts of each case."); *Fluid Drug Courier Profiles See Everyone as Suspicious*, 5 Crim.Prac. Man. (BNA) No. 14, at 333–36 (July 10, 1991) (citing a full page of contradictory characteristics held to fit the drug courier profile in cases across the country).

The principal, though unarticulated, reason for Taylor's being singled out for questioning was his race. It is beyond dispute that race is a constitutionally impermissible basis upon which a law enforcement officer may decide to stop and search a person. Despite this established principle, the majority nevertheless validates the stop and seizure in this case. I can only assume that Judge Martin is correct in concluding that the majority's unarticulated reason for taking such a step is furtherance of the war on drugs. While I sympathize with those whose job it is to fight this unfortunate war, I do not believe that it is the function of a court to facilitate the war in violation of the United States Constitution. On the contrary, courts exist to ensure that the Constitution is upheld, even in the face of national crises. The majority, however, in order to reach its result in this case, has signed on to a law-enforcement strategy that adroitly and skillfully circumvents the document which has been the foundation of our nation for two hundred years.

One would have hoped that at this stage in the United States' development the lessons of our past would be learned: that in times of crisis, courts must be unyielding to the passions of the moment. That truism certainly springs, inter alia, from our World War II experience with the *Korematsu* case. The country is in the midst of another war, albeit of a different type, and we would do well to remember the words of Justice Murphy's dissent in *Korematsu*. He cautioned that while the "scope of ... discretion [of those waging the war] must, as a matter of necessity and common sense, be wide," likewise "[i]ndividuals must not be left impoverished of their constitutional rights on a plea of military necessity that has neither substance nor support." *Korematsu v. United States*, 323 U.S. 214, 234, 65 S.Ct. 193, 202, 89 L.Ed. 194 (1944) (Murphy, J., dissenting). Justice Murphy's wisdom is demonstrated in that he actually predicted that the *Korematsu* decision might someday lead to a result such as the one the majority has reached in this case. *Id.* at 240, 65 S.Ct. at 205 (Murphy, J., dissenting) (warning that the Court's holding in *Korematsu* would "encourage and open the door to discriminatory actions against other minority groups in the passions of tomorrow").

The final irony I wish to note is that the protections of the Bill of Rights are being weakened at the very time that South Africa and the countries of Eastern Europe are seeking to import them into their own body of laws. American jurists and lawyers are traversing the oceans to lend their expertise to the emerging democratic governments and freedom movements to this end. I can only hope that our example will continue to teach these nations that civil rights must be protected both in word and in deed.

Some may conclude that I am magnifying the significance of the majority holding. I do not think so. This Court has today joined in a tragic retreat from those principles that have made this nation stand as a beacon of hope to the oppressed throughout the world. It is a retreat in which I, and my dissenting colleagues, cannot, in silence, participate.

I respectfully dissent.