34 F.3d 1068
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Jerry BLACKWELL, Defendant-Appellant.
 No. 93-4308.
 United States Court of Appeals, Sixth Circuit.
 Aug. 22, 1994.
 
 Before: NELSON and DAUGHTREY, Circuit Judges, and WELLFORD, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Defendant Jerry Blackwell, alleging that his Fourth Amendment right to be free from unreasonable searches and seizures was violated, appeals the district court's denial of his motion to suppress evidence. We find no error and affirm.
 
 
 2
 This case arises out of the stop and search, and subsequent arrest, of the defendant at Cleveland's Hopkins Airport. The events that led to Blackwell's arrest began on January 28, 1993, when Deborah Harrison, a Cleveland Police Department detective assigned to the airport drug interdiction team, informed DEA Special Agent and team member Maureen McCabe that another Cleveland Police Department detective, Detective Muhic, had received a tip from a reliable informant. According to Harrison, this particular informant had previously provided information on more than one occasion, resulting in the seizure of several kilos of cocaine. On this occasion, the tip indicated that a youngish, African-American male, dressed like a college student, would be arriving from Los Angeles with two kilos of cocaine. The tip further indicated that the individual, aware that drug-sniffing dogs were usually deployed at the airport beginning at 9:00 A.M., would arrive before that time. Accordingly, for the next two days--January 29 and 30, a Thursday and Friday--members of the interdiction team observed those flights arriving from Los Angeles before 9:00 A.M. However, there was no one on these flights matching the description supplied by the informant.
 
 
 3
 Sometime during the following week (most likely on Thursday, February 4), Harrison asked Muhic whether the subject of the tip had flown to Cleveland yet. Muhic told Harrison that, according to the informant, he had not yet left Los Angeles. Prompted by this information, on Friday, February 5, the interdiction team assembled at Concourse C to await Continental Flight 540, scheduled to arrive from Los Angeles at 7:20 A.M. The team that day consisted of McCabe, Harrison and a Deputy Sheriff Acklin, to be joined later by a fourth officer. All were dressed casually; McCabe was wearing jeans, a sweatshirt, and sneakers.
 
 
 4
 The flight arrived at 7:40 A.M., and defendant Blackwell, a 46-year-old African-American male, deplaned. Carrying a blue nylon garment bag, Blackwell walked towards the higher number gates, away from the baggage area, as if to make a connecting flight. Given this particular passenger's age, i.e., too old to be a college student, the interdiction team initially paid Blackwell no notice.
 
 
 5
 Several passengers later, Michael Brooks deplaned, empty-handed. Brooks, a youngish African-American male wearing a college jersey, fit the description provided by the informant, but he, too, walked towards the higher number gates and not toward the baggage-claim area. Therefore, the agents remained at the gate.
 
 
 6
 Approximately five minutes later, however, members of the team observed Blackwell and Brooks walking, apparently together, back towards them, away from the concourse and in the direction of the baggage area. Brooks was now carrying the blue garment bag with which the defendant had deplaned. Before leaving the concourse, however, Blackwell and Brooks split up. Brooks purchased a pack of cigarettes at a newspaper stand and then retired to a designated smoking area. Blackwell had his shoes shined at a stand that provided a view of the concourse. According to Agent McCabe, unlike the other customers at the stand, Blackwell was "looking outside toward the concourse area." McCabe later characterized Blackwell's behavior as "nervous." After approximately 15 minutes, Blackwell left the shoe shine stand and nodded at Brooks. The pair then proceeded towards the baggage-claim area, with Brooks following approximately 20 feet behind Blackwell.
 
 
 7
 By the time the pair arrived at the baggage-claim area, it was almost empty. Blackwell scanned the area, picked up a white, black, and green gym bag, and headed towards the exit, where Brooks was waiting immediately outside. As the pair began to hail a taxi, Agent McCabe approached Blackwell and Detective Harrison approached Brooks. Agent Stirling stood approximately six to seven feet away from Blackwell and McCabe. Deputy Acklin similarly assisted Harrison.
 
 
 8
 Agent McCabe identified herself to Blackwell and showed him her DEA credentials. Blackwell then complied with McCabe's request to examine his airline ticket and a picture I.D. McCabe testified that she explained to Blackwell that she was part of a drug interdiction team and asked Blackwell if she could search his bag. Blackwell did not respond initially, McCabe testified, so she repeated the question. According to McCabe's testimony, which the district court credited, Blackwell replied, "Sure, go ahead."
 
 
 9
 Before searching the gym bag, which Blackwell had placed on the ground, Agent McCabe asked him if the bag was his. Blackwell responded positively affirmatively and McCabe went through the bag, finding two kilos of cocaine in the process. Although the bag had ID tags on it with Blackwell's name and his California address, he disavowed any knowledge of the cocaine. He was arrested and subsequently charged with possession of cocaine with intent to distribute, in violation of 21 U.S.C. Sec. 841(a)(1).
 
 
 10
 According to McCabe's testimony, no weapons were drawn or displayed at the time by any member of the team. During McCabe's stop and search of Blackwell, Harrison was following a similar procedure with Brooks. As it turned out, however, Brooks had no cocaine on his person or in the blue garment bag he was carrying. Hence, Brooks was not arrested or charged.
 
 
 11
 Following his indictment, the defendant moved to suppress the evidence obtained in the search of his gym bag, alleging that he was seized and his luggage searched in contravention of the Fourth Amendment. At the ensuing suppression hearing, Agent McCabe and defendant Blackwell were the only witnesses.
 
 
 12
 Blackwell's testimony conflicted with that of McCabe's in only one significant aspect. Specifically, Blackwell testified that when Agent McCabe asked to search his bag, he responded by asking her if she had a search warrant. According to the defendant, McCabe replied that she did not need one because she had probable cause. McCabe specifically denied that this exchange occurred. The district court found McCabe's testimony more credible than Blackwell's and also found that Blackwell consented to the search.
 
 
 13
 Thereafter, the defendant entered a conditional guilty plea, reserving his right to appeal the denial of his suppression motion.
 
 
 14
 On appeal, our review of the factual record is limited by certain well-settled principles of law. " 'The finding that a citizen has been subjected to a fourth amendment search or seizure involves a question of fact and cannot be reversed unless clearly erroneous.' United States v. Grant, 920 F.2d at 381 (emphasis added)." United States v. Taylor, 956 F.2d 572, 576 (6th Cir.) (en banc), cert. denied, 113 S.Ct. 404 (1992). "Findings of fact anchored in credibility assessments are generally not subject to reversal upon appellant review. Clear error rarely occurs in the context of airport police-civilian encounters because resolution of fourth amendment issues in this milieu 'is going to turn largely on credibility determinations made by the district judge at the suppression hearing.' " United States v. Cooke, 915 F.2d 250, 252 (6th Cir.1990), quoted in Taylor, 956 F.2d at 576. Questions of law, of course, are reviewed de novo. Holmes v. Donovan, 984 F.2d 732, 735 (6th Cir.1993).
 
 
 15
 The defendant contends that "the initial contact between himself and the agents was not permissible," that the subsequent detention was not supported by a reasonably articulable suspicion, and that the search of his bag was not the result of a valid consent. He cites as support two airport-profile cases, United States v. Taylor, 956 F.2d 572 (6th Cir.1992) (en banc), and United States v. Garcia, 866 F.2d 147 (6th Cir.1989), and a border-patrol type search case, United States v. Grant, 920 F.2d 376 (6th Cir.1991). After careful study, we conclude that the legal analysis and the holdings in those cases do not support the defendant's suppression argument.
 
 In Taylor, we noted:
 
 16
 [T]he Supreme Court and this Circuit consistently have admonished that not every encounter between a civilian and the police constitutes a "seizure" invoking fourth amendment safeguards. Relevant precedent has made clear that a seizure within the meaning and purpose of the fourth amendment does not occur when governmental agents approach a pedestrian, identify themselves as law enforcement officers, and solicit conversation or request an interview.
 
 
 17
 Taylor, 956 F.2d at 575 (citing INS v. Delgado, 466 U.S. 210, 215 (1984)); Florida v. Royer, 460 U.S. 491, 497 (1983) (plurality opinion); United States v. Mendenhall, 446 U.S. 544, 553 (1980).
 
 
 18
 "Existing precedent teaches that a 'seizure' occurs during a police-citizen encounter 'only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' " Taylor, 956 F.2d at 575-76 (quoting Mendenhall, 446 U.S. at 554). In other words, "a 'seizure' does not occur when officers approach an individual and, after identifying themselves, request an interview and an opportunity to inspect the individual's driver's license and airline ticket." Taylor, 956 F.2d at 577 (citing Mendenhall, 446 U.S. at 555). See also Garcia, 866 F.2d at 150 (an officer may approach a traveller and request to speak to him, and may continue that conversation up to the point that a reasonable person would no longer feel free to go). More specifically, a "person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained." Mendenhall, 446 U.S. at 553, quoted in Garcia, 866 F.2d at 150. "Thus, the one occurrence which seems to distinguish 'seizures' from casual contacts between police and citizens is when the defendant is asked to accompany the police or agents to a place to which the defendant had not planned to go." Garcia, 866 F.2d at 151.
 
 
 19
 Applying the above precedent to the instant facts, we conclude that the district court's finding that the contract between Agent McCabe and defendant Blackwell was not a seizure within the meaning of the Fourth Amendment was not clearly erroneous. At most, the encounter between McCabe and Blackwell could be characterized as a Terry stop, see Terry v. Ohio, 392 U.S. 1 (1968), but there was clearly a sufficient level of reasonable suspicion here to justify such a stop. At the least, the tip and the defendant's obvious connection with Brooks, the subject of the tip, and their unusual behavior inside the airport imparted the requisite degree of reasonable suspicion. See Alabama v. White, 496 U.S. 325 (1990). We hold that the brief detention of the defendant at the curb did not violate the constitutional mandate of the Fourth Amendment.
 
 
 20
 The question of whether a search was undertaken as the result of voluntary consent " 'is a question of fact to be determined from the totality of all the circumstances.' " Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973), quoted in Taylor, 956 F.2d at 577. Proof of voluntary consent to a search subsequent to a Terry-type stop must be " 'by clear and positive testimony' " and the consent must be proven to have been " 'unequivocal, specific and intelligently given, uncontaminated by any duress or coercion.' " United States v. Williams, 754 F.2d 672, 674 (6th Cir.1985), quoted in Taylor, 956 F.2d at 577-78. See also Garcia, 866 F.2d at 150.
 
 
 21
 Well-established precedent requires us to afford considerable deference to the district court's findings of fact on the issue of consent. Certainly, we cannot say that the court's credibility determination or the resulting determination of voluntariness was clearly erroneous. We therefore conclude that the validity of the search must be upheld.
 
 
 22
 Finding no error with regard to the district court's denial of the motion to dismiss, we AFFIRM the judgment of conviction entered in that court.
 
 
 23
 HARRY W. WELLFORD, Senior Circuit Judge, concurring:
 
 
 24
 I concur in the judgment of affirmance in this case, but express my concerns about several aspects of this now familiar and frequent type of drug enforcement agent contact with airplane passengers at airport terminals. This is not a drug profile case in its origin. The agents received a tip or tips about an individual, name unknown, who would arrive from a known destination with a large quantity of drugs at an early hour to avoid detection. The description of the suspect, although not specific, furnished a guide for the law enforcement team to be on the alert. It was happenstance that defendant, who was not the described suspect, was observed with the person who met the description, but they arrived on the same early flight from the location furnished to law enforcement by the tipster. The agents observed enough activity of defendant in conjunction with that of the other person who met the description to make a Terry stop and ask pertinent questions relative to a search of luggage.
 
 
 25
 I would emphasize in these cases, however, it is the duty of the courts to examine the circumstances carefully and to place the burden upon the government to support its search of a passenger's luggage. Credibility determinations are to be made by the trial judge with the opportunity to weigh inconsistencies and self-interest of the witness, along with other proper considerations. My concern here is with the district court's statement that "the court has to look at what the defendant has to gain or lose and what the agent has to gain or lose in this case, and test their credibility." The agent, however, does not gain or lose, depending upon the outcome of a suppression hearing; the agent has the solemn responsibility to tell the truth no matter what the outcome. The agents make mistakes (just as judges do), but our responsibility is to look objectively and reasonably at all the circumstances in weighing credibility, not what law enforcement has to gain or lose by its testimony.
 
 
 26
 I give no great weight in this case to agent McCabe's impression that defendant was "looking a little nervous" while in the terminal getting a shoeshine. I believe, however, we cannot conclude that the district judge was in error in finding:
 
 
 27
 The court believes the agent as to what she did and when she opened the bag, if she says she was given permission to open the bag, and she sees what appeared to be cocaine, certainly she had just cause to make an arrest at that point.
 
 
 28
 United States v. Taylor, 956 F.2d 572 (6th Cir.1992), a recent en banc decision, does support our affirmance in this case and the Supreme Court denied certiorari in that case. I deem our decision to require district courts in these cases to examine carefully all of the circumstances in connection with an agent's testimony, not concentrating on whether the agent is "gaining or losing" with respect to his or her testimony.