**UNITED STATES of America, Plaintiff–Appellant,**

v.

**Aaron L. SALVO, Defendant–Appellee.**

**No. 97–3214.**

United States Court of Appeals, Sixth Circuit.

Argued Aug. 6, 1997.

Decided Jan. 15, 1998.

---

Nina Goodman (argued and briefed), U.S. Department of Justice, Criminal Division, Washington, DC, Nancy L. Kelley and Nancy A. Vecchiarelli (briefed), Nancy A. Vecchiarelli, Office of the U.S. Attorney, Cleveland, OH, for Plaintiff–Appellant.

George Glavinos, Jr. (argued and briefed), Westlake, OH, for Defendant–Appellee.

Before: KEITH and SUHRHEINRICH Circuit Judges; ROSEN, District Judge.*

## OPINION

ROSEN, District Judge.

### I. INTRODUCTION

On November 6, 1996, a grand jury in the Northern District of Ohio returned a two-count indictment charging Aaron L. Salvo with possessing and receiving child pornography. Defendant Salvo moved to suppress statements he made to FBI agents and evidence obtained during a search of his residence, claiming that the agents held him in custody without first reading him his *Miranda* rights, and that he was coerced into consenting to a search of his residence. After an evidentiary hearing, the District Court ordered both the statements and the seized evidence suppressed. The Government now appeals the District Court's ruling. For the reasons set forth below, we REVERSE.

### II. FACTS

Defendant Aaron Salvo first came to the attention of law enforcement when officials at Ashland College, where Salvo was a student, discovered several suspicious e-mail messages. In these messages, Salvo, an Eagle Scout who had been a Boy Scout leader, stated he was a lifeguard at a Boy Scout camp and requested advice about how to seduce one of the boys at the camp. Ashland College reported this to the Ashland County Sheriff's Department, who in turn contacted the FBI.

In August of 1995, FBI Special Agent Joseph Williamson contacted Boy Scouts' administrator Barry Norris concerning Salvo's conduct. When Agent Williamson determined that Salvo posed no immediate danger to the boys at the camp, he postponed his investigation until October. Norris later informed Williamson that he would be meeting with Salvo on October 27, 1995 at a Friendly's Restaurant to confront Salvo about the e-mail messages, and to discharge him from the Boy Scouts. Agent Williamson observed the meeting from another table (without identifying himself) because he wanted to "take any necessary steps in the best interest of the investigation" in the event that Salvo attempted to destroy evidence.

Salvo came into the restaurant, where there were about a half-dozen customers, at the agreed upon time of 7:30 a.m. He sat down with Norris, and Norris asked him if he knew about anything strange or unusual happening at the camp. When Salvo replied that he did not know what Norris was talking about, Norris told him to "stop lying" because he knew what was going on. Norris then told Salvo he was discharged from the Boy Scouts and should no longer associate with the group.

After Salvo left the restaurant, Agent Williamson followed him to his dormitory. Upon reaching the dorm, Agent Williamson identified himself to Salvo, told him that he was conducting an investigation, and asked to speak with him. At this point, the testimony of Agent Williamson and Aaron Salvo differ somewhat.

#### A. Agent Williamson's testimony

According to Agent Williamson, Salvo seemed nervous, but had a fairly normal demeanor. Agent Williamson radioed two other agents who were waiting nearby to assist him. After FBI Special Agents Hayden and Marshall arrived, Agent Williamson asked where they could speak in private, suggesting Salvo's dorm room. However, Salvo replied that his roommate was asleep and he did not want to get anyone else

* The Honorable Gerald E. Rosen, United States District Judge for the Eastern District of Michigan, sitting by designation.

involved. Salvo instead suggested the computer room, which he asked a custodian to unlock.[1] Agent Williamson testified that the agents told Salvo at the beginning of the interview that he was not under arrest, that he was free to leave at any time, and that he did not have to talk to them. Agents Williamson and Hayden questioned Salvo, while Agent Marshall, a probationary agent in training, stood off to the side and took notes. Salvo eventually admitted to possessing child pornography on his computer. Agent Williamson asked if he could search Salvo's room, but Salvo said he did not want to wake his roommate. Instead, Salvo offered to go to his room himself and retrieve the information from his computer.

When Salvo returned with a disk containing some pictures, he volunteered that his roommate was no longer in the room. Agent Williamson again asked to search the room, and Salvo agreed and signed a Consent to Search form.[2] When the agents searched the room, they found that Salvo had "formatted" his computer hard drive when he returned to his room to retrieve the disk. In doing this, Salvo put the information into a file which was difficult to access by ordinary means. Salvo admitted to the Agents that he had formatted the hard drive, and the computer was taken to FBI headquarters in Washington D.C., where the information on the hard drive was retrieved.

While the agents searched the room, Salvo asked them about the nature and extent of the problems he might be facing. Agent Williamson responded that it was possible that he could face some jail time, but could possibly "skate," or receive no jail time.

Agent Williamson testified that he next met Salvo at a Burger King more than three months later, in February, 1996. Agent Williamson met Salvo inside the Burger King, but told him that it would be more appropriate to discuss matters outside the restaurant. Again, Williamson informed Salvo he was not under arrest, that he would not be placed under arrest at the conclusion of the interview, and that he was free to leave at any time. The two went to Agent Williamson's car, where Agent Williamson showed Salvo the pictures seized from Salvo's computer and told him that he faced prosecution. Agent Williamson then asked Salvo if he had told his parents about what had happened, and Salvo responded that he had not. Williamson recommended that Salvo tell his parents, form a "support group," and consult an attorney.

## B. Aaron Salvo's testimony

According to Salvo, when the agents first confronted him with the accusations in October 1995, he put his hands on his head and got sick to his stomach. He said that after they entered the computer room, Agent Williamson confronted him with evidence of the e-mail messages. Another agent said "we think you've been led astray and we are here to help you, find out what's going on." Salvo said he was an emotional wreck and claimed he repeatedly told the agents that he wanted his life back and did not want to go to prison. Agent Hayden said, "whoa, whoa, whoa. Nobody's talking about prison. Don't worry about it." Salvo said the agents replied that they expected him to skate. They then told Salvo to retrieve the photographs on disk, and everything would work out.

After Salvo returned with the disk, Agent Williamson again requested to search the room. Salvo testified that Agent Williamson said, "we can do it discreetly or go to the Courthouse and talk to the Ashland County Prosecutor, get a warrant and be back with uniformed police to conduct the search and he [Salvo] would be excluded from the room."[3] Salvo testified that when the other two agents left the room, Agent Hayden told Salvo that Agent Williamson was not playing games, and would search his room whether Salvo let him or not. Salvo testified that he felt he had no choice, so he signed the con-

---

1. The computer room is a $15' \times 30'$ room with windows to the outside and the interior of the dorm.

2. Agent Hayden also testified that Salvo had no objection to the search.

3. Williamson claims to have told Salvo simply that if he refused to consent, the agents would attempt to obtain a search warrant.

sent form. He further said that although he had formatted the hard drive, he had offered to retrieve the information once the agents had discovered it.

Salvo testified that in November, 1995, Agent Williamson told him that there would be no prosecution. However, in February, 1996, Agent Williamson called Salvo to tell him that he would be prosecuted, so it would be necessary to have another interview. When Agent Williamson and Salvo met in the Burger King parking lot, Salvo entered the FBI car to examine the pictures taken from his computer.

### III. *DISTRICT COURT'S RULING AND ISSUES PRESENTED*

The District Court ruled that Salvo's October 1995 statements to the FBI agents should be suppressed because of the agents' failure to give Salvo his *Miranda* warnings before questioning him. The Court explained its ruling as follows:

A reasonable person in the suspect's shoes would believe that he was in custody when these statements were made, that he was being accused of committing a crime and was not free to go. This is so even if the Defendant was told that he was free to go and would not be arrested at the end of the interview. Here, the agents had substantial information that this Defendant was engaged in illegal activity and had some evidence of it for significant period of time—first from the Ashland County Prosecutor and the Ashland County Sheriff and then from Ashland College officials. They coordinated with the Boy Scout leader who terminated him on the morning of October 27, 1995, for conduct related to the alleged illegal activity so that they could approach the Defendant immediately after receiving what to him was devastating news. This situation, together with agents telling him that they knew about some of his alleged illegal activity and that he should cooperate with them could lead him to reasonably believe that he was indeed not free to go despite the possible assertions by the officers to the contrary. Their conduct spoke otherwise.

(Joint Appendix, p. 18–19). The District Court ruled likewise regarding the February 1996 interview:

Here he was told that the Assistant U.S. Attorney would be prosecuting the case. The Defendant was asked to meet with the agents and give another statement. He was also told, according to the agent, things were such that maybe he should get a lawyer to have that person talk with the Assistant U.S. Attorney. A reasonable person in the suspect's situation would, under the totality of the circumstances, feel that he was in custody and was not free to go.

(J.A., p. 19).

The District Court also concluded that the evidence seized during the search October 1995 of Salvo's dormitory room should be suppressed. Although the Court acknowledged that voluntary "consent is possible even in the context of custodial interrogation," it found that in this case "any verbal or written consent was not voluntary." (J.A., p. 19). The Court explained:

This is based on the facts and circumstances described in the context on whether Defendant was entitled to *Miranda* warnings and on the coercive nature of Agent Hayden's statements to the Defendant regarding the fact that Agent Williamson meant business and that they could do it the easy way or the hard way. All of this suggested that his consent was not voluntary but was coerced under threats, veiled or otherwise.

(J.A., p. 19–20).

The Government challenges the District Court's ruling, and presents the following issues in this appeal:

1) Whether the District Court erred in ruling that, while being interviewed by FBI agents in the computer room of his dormitory and later at the fast-food restaurant, Salvo was in custody and therefore entitled to *Miranda* warnings; and,

2) Whether the District Court erred in ruling that Salvo did not voluntarily consent to the search of his dormitory room.

## IV. STANDARD OF REVIEW

■ "On suppression issues, we review the District Court's findings of fact for clear error, but we review all conclusions of law *de novo.*" *U.S. v. Crowder*, 62 F.3d 782, 785. (6th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 731, 133 L.Ed.2d 682 (1996). The issue of whether the defendant was "in custody" is a mixture of law and fact, and is thus reviewed *de novo.* *Thompson v. Keohane,* 516 U.S. 99, 100–03, 116 S.Ct. 457, 460, 133 L.Ed.2d 383 (1995). However, "[t]he district court's findings with regard to voluntariness [of consent to search] will not be reversed unless clearly erroneous." *U.S. v. Taylor,* 956 F.2d 572, 577 (6th Cir.), *cert. denied,* 506 U.S. 952, 113 S.Ct. 404, 121 L.Ed.2d 330 (1992)(*quoting U.S. v. Rose,* 889 F.2d 1490, 1494 (6th Cir.1989)).

## V. ANALYSIS

### A. Custodial Interrogation

■ The Fifth Amendment provides that a defendant cannot be "compelled in any criminal case to be a witness against himself." Consistent with this right against self incrimination, the Supreme Court's decision in *Miranda v. Arizona,* 384 U.S. 436, 478–479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966), ruled that suspects cannot be subjected to a custodial interrogation until they have been advised of their rights. In order to encourage compliance with this rule, incriminating statements elicited from suspects in custody cannot be admitted at trial unless the suspect was first advised of his or her *Miranda* rights. *Stansbury v. California,* 511 U.S. 318, 322, 114 S.Ct. 1526, 1528–29, 128 L.Ed.2d 293 (1994).

■ The *Miranda* rule's application is limited to "custodial interrogations," which the Supreme Court has defined as, "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in a significant way." *Oregon v. Mathiason,* 429 U.S. 492, 494, 97 S.Ct. 711, 713, 50 L.Ed.2d 714 (1977)(*quoting Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612). Thus, in order for *Miranda* to apply, the suspect must either be actually taken into custody or the restraint on his freedom must rise to the level associated with a formal arrest. *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983). The Supreme Court has distinguished between "custodial interrogation" and the mere questioning of a suspect in a "coercive environment":

> [A] noncustodial situation is not converted to one in which Miranda applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a "coercive environment." Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer Miranda warnings to everyone whom they question.

*Mathiason,* 429 U.S. at 495, 97 S.Ct. at 714. *See also, United States v. Phillip,* 948 F.2d 241, 247 (6th Cir.1991), *cert. denied,* 504 U.S. 930, 112 S.Ct. 1994, 118 L.Ed.2d 590 (1992)("Coercive environments not rising to the level of formal arrest ... do not constitute custody within the meaning of *Miranda.*"); *United States v. Knox,* 839 F.2d 285, 291–292 (6th Cir.1988), *cert. denied,* 490 U.S. 1019, 109 S.Ct. 1742, 104 L.Ed.2d 179 (1989).

■ In applying Supreme Court precedent to questions of whether a defendant was "in custody" for *Miranda* purposes, the Courts of Appeals have relied on a totality of circumstances approach to determine "how a reasonable man in the suspects's position would have understood the situation." *Phillip,* 948 F.2d at 247 (*citing Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984)). *See also, United States v. Griffin,* 922 F.2d 1343, 1348–49 (8th Cir. 1990); *United States v. Howard,* 991 F.2d 195, 200 (5th Cir.), *cert. denied,* 510 U.S. 949, 114 S.Ct. 395, 126 L.Ed.2d 343 (1993). In fact, some judicial applications of this objective test specifically include an inquiry into whether a reasonable person in the suspect's position would have felt "free to leave." *See, e.g., United States v. Booth,* 669 F.2d 1231,

1235 (9th Cir.1981)("Based upon a review of all the pertinent facts, the court must determine whether a reasonable person in such circumstances would conclude that after brief questioning he or she would not be free to leave"); *United States v. Jones,* 933 F.2d 807, 810 (10th Cir.1991)(court affirmed trial court's determination that a reasonable person would not have felt free to leave under the circumstances); *United States v. Hocking,* 860 F.2d 769, 773 (7th Cir.1988)(partially reversed on other grounds)(in determining whether the accused was subject to custodial interrogation, the court should consider the totality of the circumstances, including the accused's freedom to leave the scene).

These cases undermine the Government's contention that the District Court utilized the wrong test by basing part of its ruling on its conclusion that a reasonable person in Salvo's position would not have believed he was "free to go." In making its argument, the Government relies upon *Berkemer v. McCarty,* 468 U.S. 420, 427, 104 S.Ct. 3138, 3143–44, 82 L.Ed.2d 317 (1984), in which the Court held that although stopping an automobile is a "seizure" under the Fourth Amendment, the occupants are not necessarily "in custody" for the purposes of the Fifth Amendment.

The distinction between these two tests is apparent in the Sixth Circuit's opinion in *United States v. Knox,* 839 F.2d 285, 289–291 (6th Cir.1988), in which this Court used different tests for the Fourth Amendment and Fifth Amendment inquiries. With respect to the Fourth Amendment seizure test, the *Knox* Court relied upon the Supreme Court's decision in *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980), which identified a "seizure" as occurring at that point in time when, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." With respect to the Fifth Amendment test, the *Knox* Court stated: "The test is an objective one: would a reasonable person in the defendant's position have felt that he was under arrest or was "otherwise deprived of his freedom of action in a significant way."" (*citing Miranda,* 384 U.S. at 477, 86 S.Ct. at 1629).

However, despite the distinctions between the Fourth and Fifth Amendment tests drawn in *Berkemer* and *Knox,* we still do not believe that these cases, even taken together, definitively establish a rule for all cases that Fifth Amendment custody determinations may not include a "free to leave" component. Several factors lead us to this conclusion.

As an initial matter, we note that both *Berkemer* and *Knox* involved brief detentions of a *Terry* stop nature. (*Berkemer* involved a traffic stop and *Knox* an airport stop-and-question). From this, the Government argues that because the suspects in these cases were not free to leave upon being stopped, but were nevertheless not entitled to *Miranda* warnings, that we should extrapolate a general proposition that the free to leave test does not apply to Fifth Amendment custody determinations. The problem with this analysis is that because both of these cases were *Terry* stop situations, the question of whether the suspects were free to leave simply did not enter into the custody determination analysis. This is so because the transitory nature of a *Terry* stop itself indicates that a suspect is not free to leave during that brief period of detention. Thus, because of the very cursory and limited nature of a *Terry* stop, a suspect is not free to leave, yet is not entitled to full custody *Miranda* rights.

However, this does not equate to a broader application of this rule to detentions of a more lengthy, substantive nature. In non-transitory, more protracted interrogation situations, the question of whether a reasonable person would feel free to leave obviously becomes more pertinent to a determination of whether the suspect is in custody for purposes of Fifth Amendment protection.

A further indication that there may be a "free to leave" aspect to Fifth Amendment custody determinations can be found in the Supreme Court's recent decision in *Thompson v. Keohane,* 516 U.S. 99, 111–13, 116 S.Ct. 457, 465, 133 L.Ed.2d 383 (1995), a jurisdictional habeas corpus case, in which the Court stated that the custody determination hinges upon whether, "given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate

the interrogation and leave." This language, although not a central holding of the case, indicates that the "free to leave" inquiry is at least a component of a Fifth Amendment custody determination (presumably with the exception of a *Terry* stop situation).

Finally, the broad language employed by the Sixth Circuit in *Phillip*—how a "reasonable man" would have "understood the situation"—clearly leaves open the possibility of a "free to leave" component to a custody inquiry, i.e., did the suspect "understand his situation" to be one in which he was not free to leave.

In short, the Government's assertion that the District Court erred in applying a "free to leave" test is not supported by the case law, which although perhaps not clear as to an exact formulation of a test, at least does not preclude a "free to leave" inquiry. Suffice it to say here, that for the purposes of a Fifth Amendment custody inquiry, we believe that courts may consider, as one component or aspect of the totality of the circumstances under which the suspect is questioned, whether a reasonable person in the suspect's position would have felt free to leave. We stress that this is not necessarily an ultimate or even dispositive inquiry; only that courts, in considering whether a suspect is "in custody" for the purposes of triggering the Fifth Amendment protections, may inquire as to whether a reasonable person in that suspect's particular circumstances would have felt free to leave. In other words, this is one permissible inquiry, among others, which courts may consider in making Fifth Amendment custody determinations. Thus, here, in utilizing a "free to leave" test in making its custody determination, the District Court did not necessarily err as a matter of law.

■ Having said this, however, we now turn to the question of whether the circumstances presented here support the District Court's ultimate finding of a "custodial interrogation" to which *Miranda* protections apply. We find they do not, and that its conclusion that a reasonable person in Mr. Salvo's circumstances would not have felt free to leave is simply not supported by either pertinent precedent or the clearly established undisputed facts of this case.

We begin our analysis with a survey of the pertinent appellate precedent. In applying the totality of the circumstances approach, several Courts of Appeals have found that when police question a suspect in a residence, these circumstances often do not rise to the kind of custodial situation that necessitates *Miranda* warnings, whether they are free to leave or not. *United States v. Howard,* 991 F.2d 195, 200 (5th Cir.), *cert. denied,* 510 U.S. 949, 114 S.Ct. 395, 126 L.Ed.2d 343 (1993)(no custody when questioning occurred at defendant's home and he was told he was not under arrest, although told to "stay put"); *United States v. Gregory,* 891 F.2d 732, 735 (9th Cir.1989)(no custody when suspect consented to brief interview in home with wife present, and agents returned guns to their holsters); *Krantz v. Briggs,* 983 F.2d 961, 962 (9th Cir.1993), overruled on other grounds, (*Miranda* warnings not required when officers went to suspect's girlfriend's home, and suspect voluntarily invited them inside and agreed to talk); *Devier v. Zant,* 3 F.3d 1445, 1458 (11th Cir.1993)(*Miranda* warnings not required when defendant questioned at home without *Miranda* warnings and then volunteered to continue questioning at station), *cert. denied,* 513 U.S. 1161, 115 S.Ct. 1125, 130 L.Ed.2d 1087 (1995).

In these cases, the factors that courts have relied upon include: (1) the purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police or voluntarily admitted the officers to the residence and acquiesced to their requests to answer some questions.

The undisputed facts of this case establish that there is simply no indicia of a custodial interrogation. First, the locations of the interviews—Salvo's dormitory computer room

and the parking lot of the Burger King restaurant—can hardly be said to be hostile or coercive environments. Unlike a station-house or security room, which can be inherently intimidating, nothing in the nature of these locations could be taken to restrain Salvo's freedom or indicate he was in custody. Nor was Salvo in a confined space in which he might have felt constrained or intimidated; the computer room was large with windows facing various public areas. Furthermore, Salvo himself selected the locations for the interviews, which indicates he felt comfortable with them. Specifically with respect to the February 1996 interview, although it took place in Agent Williamson's car outside of the restaurant, this alone is not enough to convert the interview into a custodial interrogation, as this too was a very public place, and the interview was done in a non-coercive way. Indeed, it would appear that the Agent chose his car because of the sensitivity of the subject of the interview and the fact that he was showing Salvo pornographic pictures from Salvo's own computer. In this sense, it seems the Agent chose the car out of solicitude for Salvo and to save him from a more public exposure of his criminal activity, not out of a desire to coerce or intimidate him.

We also note that Salvo had complete freedom of movement during both interviews. He was never handcuffed or otherwise physically restrained, nor was he told he was under arrest or even threatened with arrest or told to "stay put." In fact, the non-custodial nature of the October 1995 interview is made abundantly clear by the fact that Salvo, at his own initiative and without being accompanied by the agents, left the computer room and went back to his room to retrieve the computer disk. This freedom of movement, coupled with Williamson's statement to Salvo that he was not under arrest, is compelling evidence that Salvo was not in custody. *United States v. Sivils*, 960 F.2d 587, 598 (6th Cir.), *cert. denied*, 506 U.S. 843, 113 S.Ct. 130, 121 L.Ed.2d 84 (1992)(suspect was not in custody because he was told he was not under arrest and would not be placed under arrest at the conclusion of the interview, was not physically restrained, and remained free to move about during the in-

terview). Clearly, if Salvo had been in custody, he would not have been allowed to walk unaccompanied by agents back to his room to retrieve his disk. Police officers intending to effectuate a custodial situation simply do not afford detainees that kind of unrestrained liberty.

Perhaps most significantly, Agent Williamson specifically advised Salvo that he was not under arrest. The agents' testimony at the suppression hearing—which Salvo did not dispute—was that Agent Williamson told Salvo at both meetings that he was not under arrest, that he was free to leave at any time, and that he would not be arrested at the conclusion of the interview. Several cases indicate that such a statement by a police officer is an important factor in finding that the suspect was not in custody. *See, e.g., Mathiason*, 429 U.S. at 495, 97 S.Ct. at 713–14 (defendant who was questioned by officer at police station was not in custody where officer informed defendant that he was not under arrest and defendant was allowed to leave at the conclusion of the interview); *Sivils*, 960 F.2d at 598 (no custody where defendant was informed before questioning began that he was not under arrest and would not be arrested at the conclusion of the interview); *United States v. Macklin*, 900 F.2d 948, 951 (6th Cir.), *cert. denied*, 498 U.S. 840, 111 S.Ct. 116, 112 L.Ed.2d 86 (1990)(record would not support finding that defendants were in custody where agent repeatedly told the defendants that they were not under arrest and that they were free to cut off his questioning at any point). Given the uncontradicted testimony that Agent Williamson informed Salvo he was not under arrest and was free to leave at any time, and given the non-coercive circumstances surrounding the interview, no reasonable person could view this situation as custodial or equivalent to a formal arrest.

The District Court concluded that even if Salvo "was told that he was free to go and would not be arrested at the end of the interview," Salvo was nevertheless in custody because the agents' "conduct spoke otherwise." In reaching this conclusion, the District Court relied upon several factors that purportedly support this conclusion. Howev-

er, a review of these factors reveals that the District Court was more focused on what the agents knew about Salvo's activities, rather than what their actual conduct was toward Salvo and whether, as a result of that conduct, he reasonably should have felt he was in custody.

First, the District Court found that the agents "coordinated with the Boy Scout leader who terminated Salvo on the morning of October 27, 1995, for conduct related to the alleged illegal activity so that they could approach [Salvo] immediately after receiving what to him was devastating news." However, the District Court failed to show that there was any nexus between the timing of this first interview and the alleged custodial status of Mr. Salvo. While one could argue that the agents selected the timing of the interview to extract information from Salvo while he was at an emotional low, the timing of the interview has no bearing on the question of whether a reasonable person in Salvo's position would believe that he was subject to restraints comparable to formal arrest.[4]

Rather, with regard to the first interview, the District Court stated that the agents "had substantial information that [Salvo] was engaged in illegal activity" and that they "knew the nature of the illegal activity and had some evidence of it for a significant period of time—first from the Ashland County Prosecutor and the Ashland County Sheriff and them from Ashland College officials." But here again, a custody determination does not depend on the subjective knowledge of the interrogating officers. *Stansbury*, 511 U.S. at 322–24, 114 S.Ct. at 1529. To the extent the law enforcement officer's information and beliefs remained unarticulated throughout the interview, they have no bearing on the question of whether the suspect was in custody. *Berkemer*, 468 U.S. at 442, 104 S.Ct. at 3151. At the time of the first interview, the agents told Salvo they knew about Brandon, the boy he wanted to seduce, and Brian, the person he communicated with

via e-mail. Aside from this information, there is no indication that Salvo was given any specific knowledge about the extent of the information the agents had acquired concerning his illegal activity, the duration of the agents' investigation, or the agents' consultation with local authorities and college officials.

But, even if Salvo had been told everything the agents knew, without some additional conduct by the officers indicating a custodial situation, the state of the officers' knowledge, although possibly a factor in determining custody, does not itself determine custody. Here, although the District Court properly noted that during the first interview the agents told Salvo that they "knew about some of his alleged illegal activity and that he should cooperate with them," it did not indicate how the fact that the officers informed Salvo of this information actually led Salvo to believe he was not free to leave. It is well-settled that in order to impact upon the custody determination, the communication of these statements must somehow relate to the suspect's freedom of action.

> An officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned. [Cites omitted]. Those beliefs are relevant only to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breath of his or her " 'freedom of action.' " [Cites omitted]. Even a clear statement from the officer that the person under interrogation is the prime suspect is not in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest.

*Stansbury*, 511 U.S. at 325, 114 S.Ct. at 1530. While the agents' statements made it clear that Salvo was the target of a criminal investigation, Salvo's freedom of action, during and after the interview, mitigated against the possibility he would feel "in custody."

---

4. Williamson claims he went to Friendly's Restaurant that day to "take any necessary steps in the best interest of the investigation" in the event that Salvo attempted to destroy evidence. Of

course, Salvo did attempt to destroy, or at least conceal, evidence when he formatted his hard drive.

The same analysis applies with equal force to the second interview in which Agent Williamson showed Salvo the pictures seized from his computer and told Salvo that "the Assistant U.S. Attorney would be prosecuting the case" and that "things were such that maybe he should get a lawyer to have that person talk with the Assistant U.S. Attorney." Although the information imparted to Salvo in this interview made it clear that the Government would prosecute, Agent Williamson's statements to Salvo at the beginning of the interview—that he was not under arrest, that he was free to leave at the end of the interviews, and would not be placed under arrest at the conclusion of the interview—mitigated against any possibility that the statements pertaining to future prosecution could lead a reasonable person to feel as though he was in custody at that time.

In conclusion, given the totality of the circumstances in this case, we believe that Mr. Salvo was not "in custody" for the purposes of the Fifth Amendment's protections. Although the District Court's inquiry into whether a reasonable person in Salvo's position would have felt free to leave was permissible, it was not sufficient because it did not go far enough and its conclusion was not supported by the record. As the Supreme Court stated in *Mathiason*, police questioning, by its very nature, is always going to have coercive aspects to it. That does not mean, however, that a suspect is "in custody" each time he or she is questioned by a law enforcement officer. In this case, the restraint exercised by the agents never approached the level associated with either formal arrest or a coercive context tantamount to custody. Therefore, Mr. Salvo was not entitled to his *Miranda* warnings, and the District Court's decision to suppress the statements Salvo made during the interviews is REVERSED.

### B. Search and Seizure

The Fourth Amendment protects citizens against unreasonable searches and seizures. Of course, a search is not "unreasonable," and thus not violative of the Fourth Amendment, if the suspect voluntarily consents to the search. The Government bears the burden of proving the consent to search was voluntary under the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 248, 93 S.Ct. 2041, 2058–59, 36 L.Ed.2d 854 (1973). This burden entails proving by "clear and positive" testimony that the consent was "unequivocal, specific, intelligently given and not influenced by any duress or coercion." *Taylor*, 956 F.2d at 573.

In the instant case, the District Court ruled that Salvo's consent to search his dorm room was involuntary:

The court finds under all of the circumstances that the evidence seized in the search of October 27, 1995, should also be suppressed. Though consent is possible even in the context of a custodial interrogation, it must be voluntary. The Defendant admits he agreed to the search and signed the consent form but argues that he was coerced into signing. The court finds that any verbal or written consent was not voluntary. This is based on the facts and circumstances described in the context on whether Defendant was entitled to *Miranda* warnings and on the coercive nature of Agent Hayden's statements to the Defendant regarding the fact that Agent Williamson meant business and that they could do it the easy way or the hard way. All of this suggested that his consent was not voluntary but was coerced under threats, veiled or otherwise.

(Court order, p. 10).

Thus, the District Court's ruling was based, at least in part, on its determination that the agents had subjected Salvo to a custodial interrogation without first informing him of his *Miranda* rights. As our custody determination makes clear, Salvo was at no time in custody, and was not entitled to his *Miranda* warnings. Thus, to the extent that the District Court relied upon the circumstances which it believed created a custodial environment to find that these circumstances were coercive, we reject that finding as unsupported.

But, even if Salvo was in custody, that by itself would not be enough to vitiate an otherwise valid consent to search. *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976)(holding that suspect in

police custody could voluntarily consent to a search, inasmuch as under the totality of the circumstances test, custody, standing alone, was insufficient to indicate consent was coerced). In short, because Salvo was not in custody at the time he consented to the search, the District Court erred in ruling that his custodial status contributed to the involuntariness of the search.

The District Court's second reason for finding Salvo's consent was involuntary was that Agent Hayden said "that Agent Williamson meant business and that they could do it the easy way or the hard way." (Court's Order, p. 11). The exact exchange, according to Salvo's testimony, was as follows:

Q. What occurred then?

A. One of the agents told me that, you know, I could either consent and let them search it discretely or that they could go to the courthouse, talk to the Ashland County Prosecutor, get a search warrant, and be back with uniformed police or sheriff's officers, and they would conduct the search, and I would not be allowed to be in my room.

Q. How did you feel about that?

A. I didn't want that. I was scared of the prospect.

Q. Did there come a point in time where you agreed to allow them to search the room?

A. Yes, reluctantly yes.

Q. And how did that come about?

A. At one point, Agent Williamson and I believe it was Agent Marshall, left the computer room, and I just sort of sat there, you know, with my hands in head—in my hands, and I recall Agent Hayden saying to me look, you know, he—Detective Williamson is not playing games with you, you know. He's going to search your room whether you let him or not. He gets a search warrant, its not going to be a problem. And he said it would be just a whole lot easier for you and us if you—if you consented to the search.

(Salvo Transcript, p. 55; J.A., p. 78). While the agents' testimony contradicts this account, even taking the facts as Salvo has presented them, it is evident that the conversation centered around the agents obtaining a search warrant if Salvo did not consent.

It is well-settled that the agent's statements to the effect that he would obtain a warrant if Salvo did not consent to the search does not taint Salvo's consent to a search. In *United States v. Blanco,* 844 F.2d 344, 351 (6th Cir.), *cert. denied,* 486 U.S. 1046, 108 S.Ct. 2042, 100 L.Ed.2d 626 (1988), this Court affirmed a district court's ruling that a consent to search was voluntary, even though the investigating agent informed the suspect that if he refused to sign a search to consent form, the agent would attempt to secure a search warrant. *See also, United States v. Watson,* 117 F.3d 1421, 1997 WL 377035, * 3 (6th Cir.)(unpublished disposition), *cert. denied,* —— U.S. ——, 118 S.Ct. 393, 139 L.Ed.2d 307 (1997)("Notifying a person that a warrant can be obtained does not render consent involuntary unless the threat to obtain the warrant is baseless.")(citing *United States v. White,* 979 F.2d 539, 542 (7th Cir. 1992)("When the expressed intention to obtain a search warrant is genuine ... and not merely a pretext to induce submission, it does not vitiate consent.")); *United States v. Evans,* 27 F.3d 1219, 1231 (7th Cir.1994)(consent to search was not tainted because agents informed consentee that they would obtain a warrant if he would not consent); *United States v. Duran,* 957 F.2d 499, 502 (7th Cir.1992); *United States v. Hummer,* 916 F.2d 186, 190 (4th Cir.1990), *cert. denied,* 499 U.S. 970, 111 S.Ct. 1608, 113 L.Ed.2d 670, abrogated on other grounds, 96 F.3d 102 (4th Cir.1996)("The fact that a search warrant is mentioned 'does not necessarily constitute a coercive factor negating consent.' ") (quoting *United States v. Vasquez,* 638 F.2d 507, 528–29 (2nd Cir.1980), *cert. denied,* 450 U.S. 970, 101 S.Ct. 1490, 67 L.Ed.2d 620 (1981)); *United States v. Kaplan,* 895 F.2d 618, 622 (9th Cir.1990)("consent is not likely to be held invalid where an officer tells a defendant that he could obtain a search warrant if the officer had probable cause upon which a warrant could issue"); *United States v. Dennis,* 625 F.2d 782 (8th Cir.1980).

In this case, Agent Williamson testified that prior to going to Salvo's room, he had sufficient information to obtain a search warrant. (Williamson Transcript, p. 41; J.A., p. 64). There is no evidence on the record that the agents' statements that they would secure a search warrant if Salvo did not con-

sent were baseless or a pretext to coerce Salvo, and, therefore, the statements do not render Salvo's consent involuntary.

Given the other circumstances surroundings the search, such as Salvo's freedom of movement and the agents' statements that Salvo was not under arrest, and given that Salvo signed a consent form, we find that the Government has proven by clear and positive testimony that Salvo's consent was not influenced by duress or coercion. Although this Court generally gives great deference to the District Court's findings of fact regarding the issue of consent, it is clear that the District Court erred in excluding the evidence. Therefore, because the District Court's findings with regard to the voluntariness of the consent to search were clearly erroneous, we REVERSE its ruling to suppress the evidence.

## VI. *CONCLUSION*

In summary, the District Court's ruling to suppress Salvo's statements because he was subjected to a custodial interrogation without first being advised of his *Miranda* rights is **REVERSED**. The District Court's ruling that Salvo did not voluntarily consent to the search of his room is also **REVERSED**.