**UNITED STATES of America, Plaintiff,**

v.

**Major PATRICK, Defendant.**

**No. CRIM. A. 98–50024.**

United States District Court,
E.D. Michigan,
Southern Division.

July 28, 1998.

Earl R. Spuhler, Miner, Spuhler, Fenton, MI, Brenda R. Williams, Flint, MI, for Defendant.

James Mitchell, U.S. Attorney's Office, for U.S.

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

GADOLA, District Judge.

Before the court is a motion to suppress evidence filed by defendant, Major Patrick. For the reasons set forth below, this court will deny defendant's motion.

### Factual Background

In the early morning hours of December 24, 1997, Officers Green and Weston of the Flint Police Department were on routine patrol in the area of Dupont Street and E. Baltimore Street. While traveling southbound on Dupont Street, Officer Weston observed a burgundy colored Chevrolet van turn the corner from southbound Dupont Street onto eastbound Baltimore Street without using its turn signal. Officer Green then observed the van extinguish its headlights and proceed approximately 30 feet at an extremely slow rate of speed.

Believing that the operator of this vehicle might be preparing to commit a crime, Officer Green instructed Officer Weston to turn around so that the two officers could investigate. Officer Weston proceeded to turn around and he ultimately pulled up behind the van. When the officers pulled up, the driver of the van, later identified as defendant, was exiting the vehicle. Through the window of the police cruiser, Officer Green asked defendant for his drivers license, which defendant produced. Officer Green then exited the police cruiser to speak with defendant. Defendant informed Officer Green that he had pulled around the corner because he had seen a suspicious man farther east.

Officer Green looked in that direction, but saw no one.

Officer Green police report reads as follows:

> Green then asked [defendant] did he have any weapons and he replied "no". Green then asked if [it] was okay to frisk him for weapons and he consented with no problems. Green did not find anything. Green was still curious that [defendant] may have had a weapon due to him turning off his lights and him checking on suspicious people. Green then asked [defendant] if he could search his vehicle and he stated "go ahead". Green then asked [defendant] to step to the front of his vehicle while Green started to search his vehicle. Green then placed his hand under the drivers side captain chair and felt a fanny pack. Green then pulled the pack out and stated what is this and he replied his money. Green then opened the pack in front of defendant and Green saw a clear plastic bag [with] what appeared to be plastic wrapped in a tubular shape with a white powder substance. Green asked [defendant] "what is this?" [Defendant] then stated "can't we work this out?" Green then pulled out that plastic bag and saw another plastic bag [with] what he knew to be crack cocaine. Green then advised [defendant] that he was under arrest for PWID Cocaine.

The fanny pack contained a total of three plastic bags and $7,000.00 in cash. One of the plastic bags contained 27 baggies of powder cocaine of approximately one gram each. The other two plastic bags contained a total of 144 baggies of "crack" cocaine "rocks."

Officer Green then asked defendant if he would consent to a search of the house at 4802 Dupont, the address at which the van was parked. At first defendant claimed that he did not live there and that the house belonged to his girlfriend. However, according to Officer Green, ultimately defendant admitted that he lived at that address and he gave his consent to a search. Once inside the house, Officer Green asserts that defendant directed the officers to a blue lunch box on top of a cupboard. The lunch box contained a digital scale and packaging materials consistent with the packaging of the powder

cocaine and cocaine base found in the fanny pack.

For his part, defendant claims he never gave the officers permission to search the van because the van did not belong to him. However, he does admit that he ultimately allowed the police officers to enter the house by showing them the key to the front door. It is also undisputed that the police did not advise defendant of his Miranda rights until he arrived at the police station after the searches were concluded.

Defendant was subsequently indicted by a federal grand jury on two counts of violation of federal drug laws.

### Discussion

■ At the outset, it seems clear that the officers had probable cause to conduct an investigatory stop in this case. *See United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989)(holding that a police officer "can stop and detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause"); *see also Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889, (1968). The vehicle operated by defendant was proceeding very slowly down the street and its lights had been extinguished. Under those circumstances, the officers were justified in conducting an investigatory stop.

With respect to the search of the van, after reviewing the testimony in this case, this court finds that the events of December 24, 1997 were substantially as they were described in Officer Green's police report. Specifically, this court finds that Officer Green asked defendant if he could search the van, and the defendant gave his consent without an express limitation. Accordingly, the key issue with respect to the search of the van is whether defendant's consent to the search of the van operated as consent to open the fanny pack.

In *Florida v. Jimeno,* 500 U.S. 248, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991), the Supreme Court was faced with facts similar to those found in the instant case. A police officer initially overheard a suspect arranging what appeared to be a drug transaction on a public telephone. Believing criminal activity was afoot, the officer followed the suspect's car and observed the suspect making a right turn at a red light without signaling. The officer pulled the suspect over in order to issue him a traffic citation. The officer informed the suspect of the reason for the stop, but also indicated that he had reason to believe the suspect was carrying narcotics in the car. He asked permission to search the car. The suspect gave his consent to the search. The officer opened the passenger side door and observed a brown paper bag on the floorboard. The officer picked up the bag, opened it, and found a kilogram of cocaine inside.

The Supreme Court held that the search in *Jimeno* did not violate the Fourth Amendment because the search did not exceed the scope of the consent. The court noted that "[t]he standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective reasonableness'- what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Id.* at 1803–04 (citations omitted). The court went on to note that "[t]he scope of a search is generally defined by its expressed object." *Id.* at 1804. The court pointed out that the officer had informed the suspect that he believed there were narcotics in the vehicle and that he would be searching for narcotics. The court then held that it was objectively reasonable for the officer to conclude that the general consent to search the suspect's car included consent to search containers within that car which might reasonably be thought to bear drugs. Accordingly, the Court held that the search was reasonable under the Fourth Amendment.

There are important distinctions between *Jimeno* and the instant case. Most notably, the officers in this case never indicated specifically that they were searching for drugs. In fact, Officer Green's police report indicates that, after patting defendant down, "Green was still curious that [defendant] may have had a weapon ...." Accordingly, it appears that the officers in this case were more concerned about weapons than drugs. In addition, this court is satisfied from the testimony that Officer Green did not believe

at the time of the search that the fanny pack contained a gun. However, as *Jimeno* makes clear, the officers' subjective intentions are immaterial to the determination of the scope of defendant's consent to the search. Rather, this court must consider what the typical reasonable person would have understood by the exchange between the officer and the suspect.

■ Viewing the totality of the circumstances in this case, this court is persuaded that defendant effectively consented to a search of the fanny pack found within the vehicle. In this case, the officers asked defendant if he had any weapons, and then asked for, and received, permission to pat defendant down for weapons. After this exchange, Officer Green asked, without limitation, whether he could search defendant's vehicle. Defendant indicated that Officer Green could "go ahead." In *United States v. Strickland,* 902 F.2d 937 (11th Cir.1990), the Eleventh Circuit held that, "[w]hen an individual gives a general statement of consent without express limitations, the scope of a permissible search is not limitless. Rather it is constrained by the bounds of reasonableness: what a police officer could reasonably interpret the consent to encompass." *Id.* at 941. In *United States v. Snow,* 44 F.3d 133 (2d Cir.1995), the Second Circuit held that "an individual who consents to a search of his car should reasonably expect that readily-opened, closed containers discovered inside the car will be opened and examined." *Id.* at 135. The court went on to conclude that the holding of *Jimeno* would survive even in a case where "the purpose of the search is not apparent." *Id.* (citing *United States v. Crain,* 33 F.3d 480, 483–85 (5th Cir.1994)). Here, though the officers did execute a routine pat-down for weapons prior to asking for consent to search the van, the officers never indicated the specific object of the search of the van. Under these circumstances, this court does not find that it would have been apparent to a reasonable person viewing the scene that the officers were limiting themselves to a search of the van only for weapons. Given that the purpose of the search was not readily apparent, this court will adopt the analysis of the Second Circuit in *Snow* and hold that the defendant should have expected that readily-opened, closed

containers, like the fanny pack, would be opened and examined. Accordingly, this court finds that defendant's general consent to a search of the van included his consent to a search of the contents of the fanny pack.

This court also finds probative the fact that defendant never objected to the opening of the fanny pack at the time the search was conducted. Officer Green pulled the fanny pack from under the seat, and then asked defendant what was contained in the pack. The defendant answered that it was his "money." Then Officer Green opened the pack in front of defendant. At no time during this exchange did defendant object to Officer Green opening the pack. As the Ninth Circuit held in *United States v. Cannon,* 29 F.3d 472 (9th Cir.1994), "[f]ailure to object to the continuation of a vehicle search after giving general consent to search 'is properly considered as an indication that the search was within the scope of the initial consent.'" *Id.* at 477(quoting *United States v. Sierra–Hernandez,* 581 F.2d 760, 764 (9th Cir.), *cert. denied,* 439 U.S. 936, 99 S.Ct. 333, 58 L.Ed.2d 333 (1978)). *See also, United States v. Lewis,* 24 F.3d 79, 81 (10th Cir.1994)(finding that an offer of general consent to search an automobile extended to luggage contained in the trunk, and basing that finding in part on the fact that the defendant did not interpose any contemporaneous objection to the search of his bag).

Accordingly, for the reasons set forth above, in view of the totality of the circumstances in this case, this court finds that defendant did consent to the search of his van, and further that the officers did not exceed the scope of defendant's consent when Officer Green opened the fanny pack and examined its contents. Therefore, this court will deny defendant's motion to suppress the evidence found in the fanny pack.

■ This court also finds that the search of the residence at 4802 Dupont was proper. Defendant's primary argument with respect to the search of the house relies heavily on his argument that the search of the van was improper. Defendant contends that the evidence found in the van was the source of the probable cause to enter the house. Because defendant contends that the search of the

 

van was illegal under the Fourth Amendment, defendant argues that the evidence found in the house should be excluded as "fruit of the poisonous tree." *See, e.g., Wong v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). However, as discussed above, the search of the van and the fanny pack were objectively reasonable under the Fourth Amendment, and therefore defendant's reliance on the "fruit of the poisonous tree" doctrine is misplaced.

Moreover, this court notes that defendant admits that he ultimately consented to the officers' entry of the residence at 4802 Dupont. This court also finds that defendant's consent to the search of the house at 4802 Dupont was voluntary under the circumstances. In *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), the Supreme Court outlined the factors used to evaluate the voluntariness of consent to a search. Those factors include, *inter alia,* "evidence of minimal schooling, low intelligence, and the lack of any effective warnings to a person of his rights." *Id.* at 248, 93 S.Ct. 2041. The Court also noted that the accused's knowledge of his right to refuse to consent is only one factor, and not a prerequisite, in establishing voluntary consent. *See id.* at 249, 93 S.Ct. 2041.

Despite the fact that the officers did not advise defendant of his Miranda rights on the scene, this court finds that the totality of the circumstances indicates that defendant's consent to the search of the house was voluntary. The only allegedly coercive statement made by the officers on the scene was that they would obtain a search warrant if the defendant did not consent to the search. The Sixth Circuit held in *United States v. Salvo,* 133 F.3d 943 (6th Cir.1998), that such a statement does not vitiate the voluntariness of a suspect's consent to a search as long as the suggestion is neither baseless nor pretextual. *See id.* at 954. The officers had just discovered over 170 individual packets of powder and rock cocaine along with $7,000.00 in cash. Under those circumstances, the statement that the officers could obtain a warrant if defendant did not consent to a search can be considered neither baseless nor pretextual. Accordingly, this court finds that defendant's consent to search the premises at 4802 Dupont was voluntary, and

therefore defendant's motion to suppress as it relates to the evidence found in the residence will be denied.

Therefore, this court having reviewed the submissions of the parties, and being fully advised in the premises,

**IT IS HEREBY ORDERED** that the motion to suppress evidence filed by defendant, Major Patrick, is **DENIED.**

**SO ORDERED.**